### EARDLEY v. TERRY et al.

No. 5646.   Decided March 7, 1938.   (77 P. [2d] 362.)

*Shay & Shay* of Cedar City, and *Ellis J. Pickett,* of St. George, for appellants.

*Orval Hafen,* of St. George, for respondent.

HANSON, Justice.

The respondent, John K. Eardley, on the 8th day of October, 1931, filed in the office of the state engineer of Utah an application to appropriate for irrigation purposes ½

cubic foot per second (½ c. f. s.) of the alleged unappropriated waters of a creek known as and called Beaver Dam Wash in Washington county, Utah. The appellants, Jed M. Terry and Edward S. Terry, duly protested the application. As ground of protest, they alleged that there was no unappropriated water in said creek at or near the points of diversion called for in the respondent's application. The state engineer denied the application. From the order of the state engineer denying the application, Eardley appealed to the district court of Washington county. That court, upon a trial duly had, awarded Eardley the right to appropriate for irrigation purposes ½ cubic foot per second of the water of Beaver Dam Wash, subject to compliance with the terms of his application and the statutes of Utah relative to the appropriation of water. The court also awarded him the right to trench in the channel of the wash at or near his points of diversion and divert the water from the channel into a ditch across his own land and return the water to the channel of the wash above the upper point of diversion of the appellant Jed M. Terry, provided such trenching and ditching did not injure the rights of appellants. The court also decreed to the respondent, Eardley, any water so increased or conserved without regard to the prior rights of the appellants. To reverse the decree of the district court of Washington county, the appellants have appealed to this court and insist that the evidence does not support the findings of fact and conclusions of law upon which the decree is based.

The findings of fact in so far as were material are:

"That there is always a surplus of water at the plaintiff's point of diversion and at the point of diversion of defendant Jed M. Terry; * * * that at all times during the year there is an underground flow of water and there is a surplus of water in the surface channel at the points of diversion of the plaintiff and of the defendant Jed M. Terry; * * * that the plaintiff, John K. Eardley, by trenching and ditching said water as aforesaid, has increased and conserved the available water both at his point of diverson and at his point of return in approximately the amount of one-half cubic foot per second,

and that said trenching and ditching can and have been done without injury to the rights of the defendants, Edward S. and Jed M. Terry; * * * that there is more water in the Beaver Dam Wash during most of the year than is decreed or granted to Edward S. Terry and Jed M. Terry, and more than necessary for the beneficial irrigation of the actual acreage irrigated by the defendants, Edward S. Terry and Jed M. Terry."

As a conclusion of law, the court found that the plaintiff, Eardley, was entitled to a decree granting his application for ½ cubic foot per second of the water to be diverted from the wash and that he was entitled to a decree allowing him to trench in the channel of the wash at or near his points of diversion and run the water from the channel above the points of diversion of defendant Jed M. Terry, and was entitled to a decree of the court granting him any water so increased or conserved without regard to the prior rights of the defendants, provided that said trenching and ditching be done without injury to the rights of the defendants.

We will briefly review the evidence upon which the findings are based. The appellants own and irrigate several small tracts of land which lie along and are irrigated from the creek in question. The right to some of this water was derived by judicial decree from the district court of Washington county many years ago. Other rights, antedating the respondent's application, were acquired by application to the state engineer of Utah. The diversion points, two in number, of Jed M. Terry are both below respondent's points of diversion. The points of diversion of Edward S. Terry, four in number, are still further down stream. The bed of the wash is composed of sand and gravel and varies in width from 200 to 300 feet in the vicinity of the Terry land. The water, especially in low season, as it flows down the wash rises and sinks several times. During the spring runoff and when freshets occur, there is probably more water in the wash than appellants are entitled to use under their decreed and appropriated rights. The appellant Edward S. Terry, for the purpose of irrigating one of his tracts of land, has

constructed a reservoir into which he diverts the water from the channel, and by this means conserves a portion of the supply. During the midsummer season, the water is insufficient to reach Edward S. Terry's lower point of diversion.

In 1931 the respondent, Eardley, dug a trench in the wash and by damming diverted the water therefrom into a ditch onto and across his own land and returned the water to the channel immediately above the upper point of diversion of Jed M. Terry. By these means the respondent claims to have increased the flow of the water. He testified that he did this trenching at his upper point of diversion and that after digging the ditch from the upper dam, the natural flow of the stream was increased ½ a second foot and that he was able to trench the stream and increase the flow without disturbing the rights of the Terrys. When asked as to the nature of the trench that he dug, he testified that he "went down as far as he could"; whether the water that he developed from the trenching affected the Terry supply he did not know, but that it may have affected it some. The respondent made some measurements of the flow of the stream above any of the diversion dams before he commenced trenching; he made further measurements after the trench had been completed, but these measurements are wholly insufficient upon which to base an accurate determination of any alleged increase in the flow of the stream.

Mr. Cannon, an engineer and water commissioner for the state engineer's office on the Virgin river, testified that he was familiar with Mr. Eardley's efforts to increase the supply of water by trenching; that he had been there one season; that Mr. Eardley went into the creek bottom some distance above his place and did some trenching in the old creek bottom, and by reason of that, increased the surface flow to some extent; that he increased it approximately ½ second foot, in his opinion; that Eardley had trenched a little below the bed of the stream; that he had never measured the trench, but would judge it to be probably a hundred feet in length. He further testified that there was

considerably more water the greater part of the season, except at Edward Terry's lower point of diversion, than was required to give the Terrys their decreed water rights and the water to which they were entitled under their certificate issued by the state engineer. We have stated all the evidence given as to the trenching and the increase of water thereby. The depth and width of the trench, how the trench could increase the flow of water, is not disclosed by any evidence before the court. The times when Mr. Cannon made his measurements, of what they consisted, how much water was then in the stream, what was the natural flow at the time, are not disclosed by the record. While the record is unsatisfacory in these particulars, however, the evidence clearly shows that, at least at times, there is unappropriated water in Beaver Dam Wash at appellant's point of diversion.

It is apparent from the pleadings, the evidence and the decree entered by the trial court that the proceedings before the court were considered as involving the litigation of the respective rights of the parties to the water of Beaver Dam Wash and a final determination of such rights and their nature and extent. The respondent was not only granted a reinstatement of his application to appropriate water and the right to continue thereunder by the decree, but he was likewise given a present grant of all water developed or conserved by him.

It should be remembered that the proceeding in the district court was by way of appeal from the decision of the state engineer rejecting respondent's application to appropriate water. Under the statute, section 100-3-8, R. S. Utah 1933, when an application is filed, the state engineer is required to determine whether there is unappropriated water in the proposed source of supply and whether the water sought to be appropriated can be put to a beneficial use and can be diverted from the source of supply without doing material injury to the prior rights of others. While the statute, R. S. 1933, 100-3-7, also provides for the filing of protests to any application to appro-

priate water, this does not enlarge the scope of the proceedings before the state engineer beyond the determination of the question above stated. The state engineer is required to determine whether the application should be rejected or approved by a consideration of the elements above stated. He does not, and has no authority in such proceeding to, fix and determine the rights of the parties to the proceeding. He simply determines whether there is unappropriated water which can be beneficially used without injury to or conflict with prior rights. If the application is approved, the applicant must thereafter construct his works, make beneficial use, and, by actual use of the water, fix the nature and limits of the rights which can be claimed and granted under the application. The approval or rejection of the application is simply a preliminary matter and is not intended to, and does not, fix the rights of the parties before the state engineer in such proceeding. When an appeal is taken from the decision of the state engineer in such a case, the trial court is required to determine the same questions de novo. It determines whether the application should be approved or rejected and does not fix the rights of the parties beyond the determination of that matter. The issues remain the same upon an appeal to this court. All that the district court or this court, on appeal from the district court, is called upon to do is to determine whether the application should be rejected or approved. If it appears that there is unappropriated water which the applicant seeks to appropriate and which he can beneficially use without injury to or conflict with the prior rights of others, then the application should be approved by the court; otherwise, it should be rejected. If the application is approved, then the applicant must proceed to perfect his appropriation as provided by law and make proof thereof under section 100-3-16 R. S. 1933. Until it is so perfected, he cannot be decreed or given present rights as under a completed appropriation. It may be that, although the application is approved, the applicant may not be able to perfect his appropriation. The mere ap-

proval of the application does not assure that an actual appropriation of water will result.

Were section 100-3-8, R. S. 1933, to be considered by itself, it might be thought that in determining whether an application to appropriate water should be approved or rejected, the state engineer, and the district court upon an appeal from the state engineer's decision, should proceed to hear and dispose of the matter and impose upon the applicant the same burdens as if it were making a final disposition of all questions growing out of the filing of the application. But section 100-3-8, supra, does not stand alone. Sections 100-3-16 and 100-3-17 must be considered in connection therewith. By those sections it is clear that no final rights are acquired until the proof required by section 100-3-16 is made and a certificate has been issued by the state engineer. Section 100-3-16 contemplates that the works, by which the water applied for is to be put to use, must be completed and the water applied for must be put to a beneficial use before a completed appropriation giving rights to the use of the water can be effected. It is also clear that the original approval of the state engineer has no efficacy except that it shows that the applicant had the right to proceed with his application. Furthermore, it must be conceded that any adjudication involved in the approval by the state engineer of an application cannot be carried over to the proceedings on final proof as a binding determination of such issues raised by the final proof as would be said to be involved in approving the application.

In his final proof, the applicant is required to show the nature and extent of the works he has constructed, the quantity of water appropriated, and the application thereof to a beneficial use. Whether the water so appropriated is subject to being appropriated and can be taken for the use contemplated without injury to the owners of prior rights is necessarily involved in making final proof and must of necessity be determined by the state engineer from the proof submitted. Certainly, the state engi-

neer could and should not rely upon the determination which he made of those matters when he approved the application as being conclusive. Nor would any protestant be concluded by such determination. He would have a right to show that no appropriation of water had been made as there was no unappropriated water available and that what was proposed and being done by the applicant would work injury to the protestant. It seems clear to us that the Legislature intended that when the application is filed, the state engineer is called upon to determine preliminarily whether there is probable cause to believe that an application can be perfected, having due regard to whether there is unappropriated water available for appropriation, whether it can be put to a beneficial use, and whether it can be diverted and so used without injuring or conflicting with the prior rights of others. If he determines there is such probability, the application is approved and the applicant then proceeds to demonstrate by an actual use of the rights sought to be acquired that he is entitled to such rights. No doubt the applicant in each case, when he files an application, is convinced that the conditions are such that he can make a valid appropriation and has worked out the means by and the manner in which he intends to proceed. We do not think that the Legislature intended that he must prove to the state engineer, when his application is up for approval or rejection, by the same kind and quantum of proof that would be required were he making final proof, that he can make an appropriation. Such a construction, in view of sections 100-3-16 and 100-3-17, would be to require him to make proof twice, once in advance of and once after the construction of the necessary works and application of the water to a beneficial use. Any application that is filed is subject to all prior rights which have accrued prior to such filing. Filing the application does not give the applicant the right or license to proceed to the injury of prior rights. He can proceed only upon an absence of injury to such rights if he hopes to perfect a right and be immune from liability. Legally, no one can be

hurt by the procedure established by the Legislature. At the same time, however, it permits the development of our water resources to the utmost.

It is not for the court, on an appeal from the decision of the state engineer rejecting respondent's application, to decree to him any waters which he may be able to obtain by conserving and increasing the flow of the stream involved. It should simply determine whether the application was rightly rejected. In determining that question, the court stands in the same position as the state engineer did. It must determine from the evidence whether there is probable cause to believe that there is unappropriated water available or water which can be made available for use; that the applicant can beneficially use such unappropriated water; and that such water can be diverted from the source of supply and used without injury to or conflict with prior rights. If the application is approved, then the applicant must proced under and be governed by the same statutory provisions as would have been applicable had his application been approved by the state engineer.

In this case no evidence was submitted by the appellants other than the testimony they gave when called as witnesses by respondent. As already stated, the evidence shows that there is some unappropriated water available at some times of the year, which water respondent can put to a beneficial use. It does not appear from the evidence that appellants will be injured by the diversion and use of such unappropriated water. They offered no evidence at all. The record is practically silent on that question.

It may be that there is nothing inherent in the manner in which respondent proposes to increase, conserve, and divert the water, as disclosed by his application, that would necessarily tend, though given proper attention and properly pursued, to injure or conflict with the prior rights of the appellants. The trial court found that the trenching and ditching done by respondent was done and could be done without injury to the rights of the Terrys.

In the case of *Tanner* v. *Humphreys*, 87 Utah 164, 48 P. 2d 484, a case involving an application to change the point of diversion the question of the quantum of proof which the applicant must produce to show that injury will not result to a protestant by changing the diversion point was discussed. It was there held that the general negative as to injury to the protestant by the applicant is sufficient to carry the case over a motion for a nonsuit in that respect. It would seem, therefore, that in determining whether an application to appropriate water should be approved or rejected, such negative by the applicant would be sufficient to put the protestant on proof that he would be injured.

In the case before us, respondent first testified that he had done certain trenching in 1931; that this increased the flow and did not disturb the rights of appellants. On cross-examination, however, he testified that developing water from the trenching might have affected appellants' supply of water. No other witness testified on this point, although two engineers were examined. Unless it be assumed from the very nature of the proposed works and the manner of increasing the flow of water and diverting it that no injury would result to the Terrys in Eardley's proceeding with the application and completing whatever appropriation that could be made, there is nothing in the record which would support a finding that the probabilities are that the Terrys would not be injured. The testimony of Eardley, as already pointed out, is very indefinite, if not conflicting. The conditions, geological and otherwise, might be such that the rights of appellants might be adversely affected by the trenching and diversion. The least that could be done would be to take some evidence upon that matter by which the probabilities could be determined, rather than leave the matter to assumption or guesswork. We think the evidence on this point is insufficient to support the findings of the court that the rights of appellants would not be injured by the proposed development and diversion of water contemplated by respondent.

Counsel for respondent relies upon the case of *Little Cottonwood Water Co.* v. *Kimball,* 76 Utah 243, 289 P. 116, 119. In that case the defendant Kimball made an application to the state engineer to appropriate 10 second feet of water of Little Cottonwood creek, which he proposed to conserve by constructing, at his own expense, pipe lines to conduct the water to those entitled to the use of it and thereby prevent loss by evaporation and seepage. The majority of this court was of the opinion that he should be permitted to do so if he could. Whether or not he could comply with the application was a different matter. This court said: "His [Kimball's] appropriation is dependent upon the execution of his scheme. If he cannot carry it out, he cannot perfect his appropriation."

In the case before us, the evidence shows clearly that there is unappropriated water at some time of the year which respondent can put to beneficial use. It does not appear from the evidence that appellants will be injured by the diversion and use of such unappropriated water. Therefore, the trial court proceeded correctly in approving the application which permits the applicant to prove definitely that there is water available. The court, however, took the view that respondent had already perfected his application and decreed to him the use of the alleged increased flow of the source without requiring the respondent to comply with the law of appropriation. This was error.

As above noted, the proceeding in the district court was by way of an appeal from the decision of the state engineer in rejecting respondent's application to appropriate water. Under the statute, section 100-3-14, R. S. 1933, when an appeal is taken from a decision of the state engineer, it is the duty of the court to try the cause de novo. The court had no power in the cause to decree to the respondent any water he may be able to obtain in the future by conserving and increasing the flow of the stream involved.

After the court has determined, as it did in this case, that there is unappropriated water in the source, it must reverse

the decision of the state engineer and permit applicant Eardley to proceed in perfecting his right, as provided by section 100-3-16. It follows that the judgment of the trial court should be, and the same is, upheld in so far only as it approves the application. However, the cause is remanded to the district court of Washington county with directions to redraft its findings of fact, conclusions of law, and decree to provide for the reinstatement of the application by the state engineer and to permit the applicant to proceed with the approved application as provided in said section 100-3-16; the parties to bear their own costs.

FOLLAND, C. J., and MOFFAT and LARSON, JJ., concur.

WOLFE, Justice (concurring in the results).

I think the time in which protest to an application to appropriate water may be made is within thirty days after completion of the publication of notice of the application to appropriate. Certain it is that section 100-3-7 gives the right to protest against the granting of the application to appropriate. No provision for publishing notice or protesting is provided in relation to making proof of beneficial use. In fact, sections 100-3-16 and 100-3-17 seem to contemplate that proof is a matter between the applicant who files application to appropriate and the state engineer, and if the latter is satisfied, he issues the certificate. The important matter to note is that neither the state engineer's "acceptance" of the application nor his issuing of the certificate can in any way disturb prior rights whether or not such prior users protest or whether they succeed in their protest. A reading of the whole statute seems to reveal what the purpose of the application is. It contemplates cases where there is probable cause to believe there are still unappropriated waters and to give the first proper applicant the priority on those unappropriated waters if any. Thus is provided mechanism to hurry such applicant along in the putting of such water to

use or to step out and let some one else use it. Sections 100-3-11 and 100-3-12. He cannot file on it and sit idly by waiting for it to become more valuable. Speculation in water rights is sought to be avoided.

If the acceptance of the application to appropriate, whether over or in absence of protest, does not affect vested prior rights, what is the purpose of permitting protest? Twofold: One to permit those with rights on the stream in which all water had been appropriated to prevent some one, especially above them, making trouble under claimed rights, and thus forcing them to seek injunction to obtain their water. In other words, to prevent him from becoming a nuisance. The second reason is, as indicated, to permit others who desire to appropriate to show that the applicant is not in earnest; that he is interjecting himself for bargaining purposes or that he can never put the water to beneficial use. Also for the purpose of giving the state engineer any information as to its interference with more beneficial use. A protestant might furnish valuable information in several regards. But, as holds the opinion, in any case the issue, whether before the state engineer or on appeal to the district court or on appeal to this court, is only on the matter of whether there was probable reason to believe there was unappropriated water. The issue ordinarily cannot be expanded to include the consideration of relative rights or to vest the applicant with a right to appropriate, but only with a right to have the status of an applicant determined, which itself, as indicated in the case of *Little Cottonwood Water Co.* v. *Kimball,* 76 Utah 243, 289 P. 116, is a valuable right.

Where I differ from the opinion in this case is in its implication that the question as to whether or not there are unappropriated waters is still open to protests by others at the time of making proof. If the protests are not made under section 100-3-7 within the thirty-day period, then the issue as far as the applicant is concerned, that there are probable unappropriated waters, is settled. Of course, if he makes proof of putting water to beneficial use and it is water to

which some one else is entitled, the certificate making him an appropriator is useless because, as a matter of fact, there will be nothing left after all the other prior appropriators get their water. And a decree adjudicating the rights on the river system might show such appropriator really had nothing but a potential right which might only yield fruit if some prior appropriator abandoned or lost his water right. But I think that when an application is accepted and no protests are filed within the thirty-day period and the engineer finds there are unappropriated waters and that the proposed use will not impair the value of existing rights or interfere with the more beneficial use of the water, then the right of the applicant to proceed to put to beneficial use is fixed. He may not be able to put unappropriated water to beneficial use because in reality there is none, but that does not mean to say that persons who have not protested within the thirty-day period fixed by the advertisement of the application still have the right to come in and protest against permitting the application at the time he endeavors to make proof. They may point out to the applicant and the state engineer that he is using appropriated waters in making proof, but they cannot affect his status as an applicant.

If, in diverting waters, he is taking some lower user's water, he will be stopped in his tracks by injunction and will never be able to make proof of a beneficial use. But if no one stops him and he diverts water and makes the proper showing of completion of works and application of water to a beneficial use, he is entitled to a certificate of appropriation. As before stated, this gives him no rights as against prior appropriators and if he is taking their water he may be stopped at any time.

In the ordinary case of a flowing stream, the engineer with his water data can add up all the appropriations and compare the total with his data and come to a fairly accurate conclusion as to whether there are unappropriated waters. It is the rarer cases, such as the one at hand, which cause the confusion. Here is a wash which varies in width from

200 to 500 feet and the water courses under and through the gravel in diffuse fashion. So it is only when the applicant channels the wash and confines the water that it can be determined whether there is more than the Terrys have appropriated. And this has led the writer of the prevailing opinion to conclude as a practical proposition that the period of action by the state engineer on the application for determining whether there are appropriated waters, extends to the time of making proof of beneficial use. But there is nothing to prevent the applicant from trenching the wash before he makes the application so as to present a situation to the state engineer at the time he files his application to appropriate and in regard to which the latter may make his examination. This is really a part of the demonstration that the applicant must make as to the physical situation before he can convince the engineer that there are unappropriated waters in the wash. The engineer otherwise may reject the application. The engineer is not compelled himself to do the physical work necessary to determine whether there are unappropriated waters in the wash. The physical situation is such that the applicant, as a preliminary to the application or while it is pending, may have to do work in order to demonstrate or to permit the engineer to determine whether there is probable cause to believe there are in the wash unappropriated waters.

This would bring us to the same result but would not hold that the question which the engineer is required to decide on the filing of the application, as to whether there were unappropriated waters in a wash or stream, was still open for decision when the works are completed and proof made of the application of water to a beneficial use. Of course, as stated before, if the applicant fails to obtain water to put to beneficial use, he cannot make proof of an application to beneficial use.