LEHI IRR. CO. v. JONES et al.

No. 7189.   Decided February 14, 1949.   (202 P. 2d 892.)

Rehearing Denied April 4, 1949.

See 67 C. J., Waters, sec. 429.

*Skeen, Thurman & Worsley,* of Salt Lake City, amici curiae.

*Fisher Harris,* of Salt Lake City, for appellant.

*Mulliner, Prince & Mulliner,* of Salt Lake City, *Grover A. Giles,* Atty. Gen. and *Edward W. Clyde,* of Salt Lake City, for respondents.

PRATT, Chief Justice.

This suit was instituted by the plaintiff to review the action of the State Engineer in approving a series of three applications on the part of the defendant to appropriate water from certain springs arising on his, the defendant's, own land. Each of the three applications was the subject of a separate action filed by the plaintiff in the lower court, but by stipulation the cases were tried together, and all are the subject of a single appeal prosecuted to this court by the plaintiff after a ruling in the lower court in effect upholding the action of the State Engineer in approving the applications of the defendant to appropriate the water therein described. In this court on appeal a brief has been filed entitled "Brief of Provo Water Users Association" and signed by counsel for that organization with the expression "Amicus Curiae" following his name. As that association is not a party to this action, we shall consider the brief as filed amicus curiae. The State Engineer responded to this brief as did also the defendant, whereupon amicus curiae filed a further brief.

The facts are largely without dispute. The plaintiff and its stockholders prior to 1903 had acquired by diligence rights certain waters for irrigation purposes. Included therein were rights to the flow of water from Dry Creek and its tributaries. The plaintiff has made no filings since 1903. The defendant, Clarence T. Jones, owned lands adjacent to Dry Creek. The general location of these lands is north and east of Lehi, Utah, some three to four miles. On a part of this land prior to 1903 there existed a fairly well defined spring which had been used for many years for culinary, stock water and limited irrigation purposes. The excess not so used flowed into Dry Creek, and formed a part of the

diligence rights of the plaintiff. In addition, there existed some few "wet spots" where waters seeped to the surface but did not collect sufficiently to create springs, and did not flow on the surface into Dry Creek.

There is some evidence that there was an increase in water to some extent as early as 1941, but not to the extent that it presently flows, and the trial court apparently considered the water as really increasing from 1944 on.

Commencing with this last year these wet spots developed into springs, and the previously well defined spring developed a flow approximately two to three times its previous flow. It is on this increased flow and the springs as developed, that the defendant, Jones, filed. The plaintiff protested the application on the part of the defendant before the State Engineer. In the file are letters from the State Engineer approving the applications. These letters indicate the basis upon which his approval was granted. The letters are substantially identical, and since they are the very foundation of this appeal and the trial de novo in the district court, we quote from one of the applicable portions: ·

"From the evidence adduced it appears quite clearly that the waters which the applicant seeks to appropriate are waste waters from irrigation of higher grounds. These waters have escaped the original appropriators and have returned to a natural water channel and issue in the form of springs. The springs from which this water issues have existed for many years and it appears that the flow therefrom in the past has all been appropriated by the protestant. However, with the increased use of Deer Creek waters thereon, the flow from the springs has, in the past few years, materially increased so that they now yield more water than would have been available to the protestants were it not for the increased irrigation of upper lands."

"It thus quite clearly appears that the applicant is seeking to appropriate waste water which is escaping from the lands of the original appropriator and has returned to a natural source. It is clear from our Utah cases such as *Clark* v. *North Cottonwood Irrigation & Water Company*, 79 Utah 425, 11 P. 2d 300, and *Stookey* v. *Green,* 53 Utah 311, 178 P. 586, that no permanent right can be obtained by appropriation as against the owner of the upper lands which would

require the upper land owner to continue to permit water to waste or seep from his lands. Under these cases and cases such as *Salt Lake City* v. *Telluride Power Co.*, 82 Utah 607, 17 P. 2d 281, and *Smithfield West Bench Irrigation Company* v. *Union Central Life Insurance Company*, 105 Utah 468, 142 P. 2d 866, it would appear that waters which have seeped from the lands of a private appropriator and reached a natural source beyond the control of the original appropriator are subject to public appropriation."

"Clearly the applicant cannot appropriate the water of Dry Creek, or of springs which form its source of supply, as that supply has existed in the past and this approval must be subject to the rights of the Lehi Irrigation Company. But, as against that company, it does appear that this increased flow of the springs caused from irrigation of higher lands might be unappropriated water. Under the case of *Little Cottonwood Water Company* v. *Kimball*, 76 Utah 243, 289 P. 116, and other similar cases, the State Engineer should approve an application if there is reasonable grounds for believing that the applicant might be able to perfect a right."

"A more serious question is raised by the fact that these waters are tributary to Utah Lake. Even though it appears unlikely that the Lehi Irrigation Company has appropriated these waters the conclusion does not necessarily follow that they are unappropriated. It has long been contended by users of water from Utah Lake that all of the waters tributary to Utah Lake have been appropriated and form a part of their source of supply. The problem is further complicated by the fact that these waters from Deer Creek have, in the main, been brought into this area from other water sheds. If it were assumed that all of the waters from Utah Lake are appropriated, as has been often contended before, the State Engineer then would still be compelled to answer the question of whether these waters brought from other water sheds and allowed to escape to natural channels are not in any event unappropriated."

"It has not yet been determined whether or not all the waters tributary to Utah Lake are appropriated, and there is at least a reasonable doubt as to whether waters brought from other water sheds, which have been allowed to escape the control of the original appropriators, are still appropriated waters. Following the rule laid down by our Supreme Court in cases like *Little Cottonwood Water Company* v. *Kimball*, supra, it would appear that there is a reasonable likelihood that the applicant can perfect this application. The application is, therefore, approved, subject to prior rights."

From this letter it is apparent that the source of the new water was the Deer Creek Project, and the increased irriga-

tion at levels above Jones' land, made possible by the project. The use of Deer Creek waters to which reference is made in the letter refers to the waters brought from the Weber River Water Shed to the Provo River Water Shed as a part of the Provo River Project, a Federal project; and the applications to appropriate water for this project stand in the name of the United States. For the importance and far reaching effect of this project see *Tanner* v. *Bacon, State Engineer,* 103 Utah 494, 136 P. 2d 957.

In the trial de novo in the district court it likewise appears from the evidence that this new water comes from that source. This being true, it is apparent that the plaintiff in the lower court ( protestant before the State Engineer) has no interest in the waters in question whatsoever. The case, however, is such that it involves more than the ordinary inquiry as between two parties litigant, wherein the issues can be settled solely as between them. We have an inquiry into matters covered by statute as to the propriety of the action of the State Engineer in approving an application to appropriate water. The Engineer recognizes this question in his letter quoted above. It is recognized in the pleadings. The applicable portions of Sec. 100-3-8, U. C. A. 1943, read as follows:

"It shall be the duty of the state engineer, upon the payment of the approval fee, to approve an application if: (1) There is unappropriated water in the proposed source;  *   *   *."

The application of this requirement to the facts of this case is the subject of the brief of amicus curiae.

Review of the State Engineer's decision is covered by Sec. 100-3-14 and 100-3-15, U. C. A. 1943, providing for a trial de novo and for trial to the court as other equitable actions.

By the statute (Sec. 100-3-8) it appears that the inquiry is primarily whether there is unappropriated water in the source (the spring) and if there is not, then the State

Engineer should not approve the application. If there is unappropriated water then the State Engineer has the duty to approve the application (subject of course to the other requirements). This court has previously considered the duty of the State Engineer in relation to the phrase "unappropriated water," and has concluded that in the statute as it existed at that time, the Engineer should approve applications if there were reasonable grounds to believe there were unappropriated waters in the source.

The language of this court in the case of *Eardley* v. *Terry,* 94 Utah 367, 77 P. 2d 362, 366, was:

"* * * whether there is probable cause to believe that there is unappropriated water available or water which can be made available for use."

In an earlier case, *Little Cottonwood Water Company* v. *Kimball,* 76 Utah 243, 289 P. 116, 118, the rule was stated in effect that the State Engineer should approve the application unless:

"* * * it clearly appears that there is no unappropriated water in the proposed source. * * * But if the question is fairly doubtful and there is reasonable probability that a portion of the waters are not necessary to supply existing rights the engineer should have the power to approve the application and afford the applicant the opportunity for an orderly recourse to the courts, who have the facilities and powers to dispose of the matter definitely and satisfactorily."

This latter statement was quoted and affirmed in the case of *Rocky Ford Irr. Co.* v. *Kents Lake Reservoir Co.,* 104 Utah 202, 135 P. 2d 108. See also *Whitmore* v. *Welch, et al.,* 114 Utah 578, 201 P. 2d 954, reaffirming this principle.

If then it is not clear that there is no unappropriated water in the proposed source, and the applicant satisfies the other requirements, the State Engineer should not withhold his approval.

The defendant (applicant before the State Engineer) in order to establish that water on which he filed was not water subject to plaintiffs' diligence rights as they existed prior to 1903, established that this was new water which resulted from the increased irrigation above his land at least a part of which irrigation was and is being made possible by the Deer Creek Project which brought new water in from another water shed. This effectively eliminated the plaintiff (protestant before the State Engineer) as its rights are limited to the flow preceding the increase. The question has been raised, however, as to whether or not these new waters after being once appropriated, are subject to another appropriation.

In the present case the protestant before the State Engineer called attention only to the rights which it claimed as diligence rights and did not raise the issue of claims of others. Similarly in the trial de novo in the district court—although after the case had been submitted ■ the protestant moved the court to allow him to submit as exhibits the filings of the United States and the State of Utah on the water from the Weber Water Shed, and its proposed transfer to the Provo Water Shed. This offer was refused. However, the State Engineer had before him when he made his determination favorable to the applicant the claims of the protestant, and his own records. The protestant aided none in the determination, but the State Engineer's own records reveal that there were approved applications on behalf of the Federal Government and the State of Utah which brought about this new water and also an exchange application on the part of the Federal Government which indicates some interest on its part in the seepage water which returned to Utah Lake. In addition, he had before him the knowledge of this matter as it is developed in the case of *Tanner* v. *Bacon, State Engineer,* 103 Utah 494, 136 P. 2d 957, supra, and the Engineer's approval of it. None of these records of others were ever put before the trial court. By virtue of Sec. 104-46-1, U. C. A. 1943, sub-

section (3), as interpreted in *State Board of Land Commissioners* v. *Ririe*, 56 Utah 213, 190 P. 59, and *McGarry* v. *Thompson*, 114 Utah 442, 201 P. 2d 288, it is clear that judicial notice may be taken of these documents as public records. Thus, it is immaterial that they were not introduced in evidence.

What then is the Engineer to do when such a picture, as we have in this case, is presented to him?

Amicus curiae argues that the exchange application spoken of above indicates that the Bureau of Reclamation is evidencing an intent to continue to exercise ownership and control of 30,000 acre feet of seepage water which ultimately enters Utah Lake from the increased irrigation at higher levels. This application has been approved by the State Engineer with a priority date ahead of defendant's application date. No doubt the figure 30,000 acre feet has been arrived at by some computation not before us in this case, but it indicates an intent to claim no more than that amount. There is nothing before us, however, which indicates what amount of seepage water may actually occur. It is problematical that the 1.8 sec. feet filings of the defendant will diminish the seepage and return flow to such an extent that it will be below the annual figure of 30,000 acre feet, assuming rights to this flow are ultimately established for the Bureau. Certain it is that some of the uses of the applicant in this case will be non-consumptive (fish culture), and in fact, may actually increase the return flow by surface return to tributaries of the Provo River and Utah Lake. Also it might reasonably be argued that the Bureau of Reclamation intended only to claim 30,000 acre feet which ultimately came into Utah Lake by seepage and return flow regardless of the number of times used intermediately, and also, that water which comes to the surface and can be beneficially used intermediately should be subject to appropriation.

There is also the question mentioned above of whether or not under Utah law water which has escaped from the

appropriator can be recaptured after it leaves the land of the appropriator. While it seems certain from the Utah cases that he can recapture it on his own land, ▪ there may well be doubt as to his right to recapture it at some later point. This court has not passed on this question. There is some intimation in some of the cases that he may not. *Clark* v. *North Cottonwood Irrigation & Water Company,* 79 Utah 425, 11 P. 2d 300; *Smithfield West Bench Irrigation Company* v. *Union Central Life Insurance Company,* 105 Utah 468, 142 P. 2d 866. Two Federal cases have been called to the attention of the court as sustaining the proposition that he may. One arose in Idaho on the Boise-Payette Reclamation Project, *United States* v. *Haga,* D. C., 276 F. 41, and one in Wyoming on the Shoshone River Project, *Ide* v. *United States,* 263 U. S. 497, 44 S. Ct. 182, 68 L. Ed. 407. There are many similarities between these cases and the present one which are persuasive, in the present case. There are also certain differences which may make those cases distinguishable. At any rate, we are not prepared to render an adjudication on this point upon the record which is before us and thus possibly determine ultimate rights at this time, but will reserve these matters until a proper case brings the issue before us. While we are appreciative of the efforts of amicus curiae in presenting this problem, we are reluctant to decide so important a problem as an initial matter without having the benefit of proceedings, arguments and parties who may be adversely affected, to aid us in this determination. This court has repeatedly indicated that an approved application only fixes a priority date for the applicant in the event applicant can perfect his appropriation. It does not give him any vested rights. In *Rocky Ford Irr. Co.* v. *Kents Lake Reservoir Co.,* supra [104 Utah 202, 135 P. 2d 113], this court stated:

"* * * unless it appears that the approval of the applications [to appropriate] will injure vested rights of prior appropriators, the application to appropriate should be approved. * * *

"This appropriation, if approved, would be junior to all existing rights or prior appropriators. Sec. 100-3-1, U. C. A. 1943; *Eardley*

v. *Terry*, 94 Utah 367, 77 P. 2d 362. If no water in excess of that necessary to supply existing rights is available in any one year the new appropriator would get none. As far as plaintiff Rocky Ford is concerned, the approval of the application could not deprive it of any rights. At most, it places Kents Lake in a position where it can unlawfully interfere with the plaintiff's rights unless plaintiff exercises diligence to prevent the same. * * *"

There are here no vested rights with which this application will interfere—at least, no such rights are called to attention of the court. It is apparently true that applicant must rely upon the applications of the United States so far as the Weber filings are concerned in order to secure at least a part, if not all, of the water upon which he has filed. If, however, there should in fact be no rights under the exchange application, or if there should be 30,000 acre feet seepage without the water applied for by the defendant, then to deny him his application would deprive him of an early priority date to which he should have been entitled.

Considering all these circumstances, it is not clear that there is no unappropriated water. To rule otherwise would be to foreclose the applicant in this case any opportunity to develop water if it in fact exists, and would have the effect of establishing a rule in this state not in conformity with the announced policy of the state to liberally construe rights toward the development and beneficial use of all waters of the state. As stated in many of our cases and as indicated in the quotation from *Rocky Ford Irr. Co.* v. *Kents Lake Reservoir Co.*, supra, if no unappropriated water in fact exists, then the defendant (applicant) would get nothing. He, of course, will take subject to all existing rights. The rights of all other parties, including those for whom amicus curiae purports to speak are amply protected. Against them it may well be that the applicant will fall down in his attempts to ultimately establish a vested right to any water. This, however, is a matter to be adjudicated when the time comes if these parties consider themselves aggrieved, or their rights threatened.

For these reasons the judgment of the District Court is affirmed.

WADE, WOLFE, LATIMER, McDONOUGH, JJ., concur.