# UNITED STATES v. DISTRICT COURT OF FOURTH JUDICIAL DISTRICT IN AND FOR UTAH COUNTY et al.

No. 7506.   Decided April 10, 1952.   (242 P. 2d 774.)

See 67 C. J., Waters, sec. 476. Waters diverted to nonriparian land, 56 Am. Jur., Waters, sec. 351; 54 A. L. R. 1411.

*E. J. Skeen, Scott M. Matheson,* U. S. Dist. Atty., Salt Lake City, *(William H. Veeder, A. Devitt Vanech, Clifford E. Fix,* all of Washington, D. C., of counsel), for plaintiff.

*Christenson & Christenson,* Provo, *Clinton D. Vernon,* Atty. Gen., *J. Lambert Gibson,* Deputy Atty. Gen., *Clair M. Aldrich, Provo,* for defendants.

WADE, Justice.

Although the decision in this case sustained defendants' contention that the court has jurisdiction to hear the appeal

from the decision of the State Engineer, defendants' petition for a rehearing. They contend that we too narrowly limited the issues which could be determined in such appeal.

First, they contend that we "presumptively" held that the Engineer could only approve or reject an application for a change of place of diversion for the full amount of water specified in the application and could not approve the application, but reduce the amount. We do not think that such construction or our opinion is justified for we did approve just such a reduction in this case though at the request of the plaintiff. If there is any doubt about this question, it should be made clear. We do not hold that the Engineer may not approve the application to change the diversion place of a part only of the water covered by the application. If there is reason to believe that only a part of the waters covered by the application may be diverted at the proposed new diversion place without interfering with the rights of others but there is no reason to believe that all of such waters could be so diverted, the Engineer in the first place and the court on appeal should approve the application to change the diversion place of only such amount of water as there is reason to believe may be changed without impairing the rights of others regardless of the amount specified in the application.

Defendants further contend that some language of the opinion should be reconsidered because it involves questions not before the court and not argued. That language in substance holds that the judgment of the district court on an appeal from the State Engineer's decision only decided issues which the Engineer could have decided and such decision has no more force nor effect than the same decision would have had if made by the Engineer; that neither determines nor adjudicates the extent or priority of the claims of either the applicant or protestants, that each determine only whether to approve or reject the application based on whether or not it finds reason to believe that the application can be approved and

the change to some extent effected without impairing the rights of others. Of course, in determining such question the claims of both the applicant and protestants must be considered but this does not require that such claims must be adjudicated. Some of such claims may have already been adjudicated and in making such decision this must be taken into consideration; others may be somewhat speculative and doubtful and such claims do not have to be adjudicated before reaching a decision, for the decision is based on law and facts which are required to only show reason to believe, and not on definite findings or conclusions of fact or law. The Engineer is an executive officer, he is not required to be trained in the law nor competent to pass on or adjudicate such legal questions.

The protestants, both in the hearing before the Engineer and by their pleading in the district court, raise highly technical legal questions, and on the appeal seek to adjudicate the extent of the right of the United States to use the water claimed by it and the priority as between it and the protestants to such use. They claim that their rights are prior to the rights of the predecessors of the United States, that they consented to the use of such waters by such predecessors only if used on the lands now covered by the waters of the Deer Creek Reservoir where they would receive the benefit of the return flow and that under the circumstances surrounding the construction of the Deer Creek Reservoir the United States abandoned its rights to the use of such waters and is estopped from now asserting the right to divert them at the new place of diversion. It is clear from their pleadings that the protestants now seek to adjudicate the rights of the United States to the use of these waters at the new diversion place, and do not concede that the decision on whether to grant the application should be based merely upon whether the court finds reason to believe that such change will not impair their rights. Of course, if they make a strong enough case so that there is no reason to believe that the change can be made without

impairing existing rights, it will be the duty of the court to deny the application, even though it does not adjudicate such rights.

Defendants correctly assert that they did not argue the questions discused in the language objected to. But the United States, contrary to our decision, argued that the so called appeal to the district court is a new and different action from the one determined by the Engineer, and that many issues which the Engineer refused, was not qualified, and had no jursdiction to determine will, under the pleadings in this case be adjudicated in the district court, and thus the United States will have been sued contrary to its sovereign immunity without consenting thereto. The defendants in their arguments did not answer this contention, apparently conceding that the issues before the district court would be greatly enlarged on the appeal. But we carefully considered these arguments of the United States and have grave doubts that if the issues may be so expanded on the appeal to the district court that such court can acquire jurisdiction to litigate such matters against the United States on account of its immunity as sovereign from being sued without its consent. We also recognize that this is not the court of last resort on that question but the federal courts have the final word thereon. We felt after studying the cases relied upon by the United States that it has misconstrued them to allow an enlargement of the issues on an appeal from the Engineer's decision to the court. We had no doubt that if the issues on such an appeal are limited to the issues before the State Engineer, then Congress has required the Reclamation Department to submit to such an appeal. Without reaching this conclusion, there is no basis for our decision found in the opinion. To arrive at our decision, we had to rely upon the conclusion reached in the language objected to in our decision or decide other questions which we did not feel were necessary to decided in view of the conclusion reached by such language. So those questions were before us and

necessary for our decision under the view we adopted. A modification of the language complained of in accordance with defendants' petition would require us to determine the question of whether the United States is immune from a suit to determine its rights to the use of this water which we were not required to determine under the view we took.

The reasons supporting the conclusions objected to are sound. The term "appeal" indicates a re-examination by a higher tribunal of issues determined in the original trial, or at least issues which could have been so determined. It is a misnomer to call it an appeal where the appellate tribunal may hear and determine issues which the original could not have determined and where such determination has the effect of adjudicating such issues which could not be adjudicated by the decision of the original officer or tribunal. We know of no case of an appeal from the decision of an executive board or officer where the appellate tribunal adjudicates new issues not within the jurisdiction of the original tribunal to determine.

It is clear that the Engineer does not adjudicate the rights of the protestants or the applicant to the use of the waters in question, nor the rights which the applicant may obtain under the application. In *re Application 7600 to Appropriate 30 Second Feet of Water*, 63 Utah 311, 225 P. 605; *Eardley* v. *Terry*, 94 Utah 367, 77 P. 2d 362; *Tanner* v. *Bacon*, 103 U. S. 494, 136 P. 2d 957; *Whitmore* v. *Murray City*, 107 Utah 445, 154 P. 2d 748; *Little Cottonwood Water Co.* v. *Kimball*, 76 Utah 243, 289 P. 116; *Lehi Irrigation Co.* v. *Jones*, 115 Utah 136, 202 P. 2d 892. A number of these cases hold that on the appeal to the district court its decision also does not have such effect but differs only from the Engineer's decision in that it is the decision on an appeal and a further step to a final decision. *Eardley* v. *Terry*, supra, *In re Application 7600*, supra. These cases discuss whether the district court on an

appeal can adjudicate the extent of the right which the applicant will acquire when it completes its proposed procedure thereunder. But *Whitmore* v. *Murray City,* supra, held that the Engineer's decision was not an adjudication against a person who could have but failed to protest an application to change the place of diversion, and even though the change was allowed the person making the change acquired no right to interefer with an existing right of a prior applicant. Since there was no protest and no appeal to the district court, we did not determine the effect of the decision of such court.

If we are correct in our conclusion that the district court on an appeal from the Engineer's decision only decides issues which the Engineer could have decided and that it does not adjudicate any rights except those on which the Engineer's decision is final unless it is set aside, then the district court on this appeal cannot adjudicate the extent or priority of the right of the United States to the use of this water. The statute makes no provision for the determination of the priorities of the applicant and the protestants or the extent of their rights. It merely requires an approval or rejection of the application and, if approved, authorizes the applicant to proceed with his proposed work and forbids him to proceed if rejected. See Sec. 100-3-10, U. C. A. 1943. It leaves the adjudication of the rights which the applicant may have or may acquire under the application, and the rights of the protestants, to the courts in another kind of a proceeding and not to the Engineer who is merely an executive officer. Neither the decision of the Engineer nor of the court on an appeal therefrom are based on a determination of the facts or the law applicable thereto but the application must be approved in both cases if the tribunal concludes that there is reason to believe that no existing right will thereby be impaired. See cases above cited to that effect. Petition denied.

McDONOUGH and HENRIOD, JJ., concur.

WOLFE, Chief Justice (concurring in the results of the opinion of Justice WADE in the matter of the petition for rehearing).

The opinion on the petition for rehearing draws a distinction between a *consideration* by the State Engineer of the claims of the applicant and the protestants in his endeavor to resolve the issue of whether there is reason to believe that a part or all of the water may be diverted without interfering with the rights of others and the *adjudication* of those claims. While I am not without doubt as to whether the Engineer does not implicity decide some of these questions in arriving at a conclusion that there are some waters which may be diverted just as the Industrial Commission in its finding that a claimant is entitled to compensation may implicity decide that such claimant is not a partner or that he must be connected as an employee when the issue of partnership or jurisdiction of the commission is raised, I am willing to accept the distinction made by Justice WADE between matters which are only considered and those which are adjudicated. But I think except on the question of his powers the distinction rather immaterial for the Engineer's finding as to any of such claims would not be final but tentative only. However, in the matter of what issues the District Court draws into the vortex of its derivative jurisdiction on appeal, it may have significance because it may be determinative of the question whether such matters are before the District Court for adjudication. I am inclined, as thinks Justice WADE, that they are not and therefore concur in that part of his opinion on the petition for a rehearing as I did in his original opinion.

But Justice WADE argues that the conclusion at which he arrives in his original opinion and in the opinion on petition for rehearing was necessary to avoid deciding the question of the immunity of the United States Govern-

ment. In both opinions he, and Mr. Justice CROCKETT in his concurrence in the original opinion, seem to concede immunity on the part of the government but hold that such immunity was waived.

I do not concur in this view: I do not think the government has any immunity to waive in this sort of a suit. As I hope to show by what follows, the very nature of the water right which the government succeeded to a transferee is one that itself intrinsically contains the obligation on the part of

"*any* holder to submit to regulation and all litigation incident or necessary to accomplish that regulation."

It is to that thesis that I now advert.

The right to the use of water is very different from the fee title to land, largely due to the very difference in the nature of the two substances. Real estate is fixed while water is fugitive. But there are other differences arising not only by the very nature of water and land but due to the exigencies growing out of early pioneer days. These required differences in legal concepts of property to be applied to the use of water in this semi-arid state as distinguished from concepts applied to personalty and realty and even from the riparian rights concept applied to streams in the wetter parts of the United States. It is necessary that water in Utah serve the greatest possible use. That was done in two ways: (1) by making the same water serve as many times as possible on its downward course; and (2) by holding each user to no more than the amount beneficially used. In early days when water was plentiful and people took it as they needed it, the concept necessarily applicable was that water belonged not to the state but to the public, that is, to the people. Also, as users increased and the same amount of water had to do for more of them, that there could be no waste. The basis, the measure and the limit of the right to use was what could be used by each

beneficially. What could not be used beneficially was wasted and this could not be permitted. As communities grew and the use of water for culinary and other consumptive purposes became more valuable, it was realized that the day of gaining rights by merely taking from the common sources as members of the public was no longer feasible. Irrigation and stock watering were considered consumptive purposes as distinguished, for instance, from power purposes, even though transpiration actually consumed comparatively little of the water. The amount needed for carrier purposes to the place of use—that is to allow for seepage and evaporation during transportation to that place of use and the additional volume needed to penetrate the ground after it got there to the points where the physiological process of transpiration ensued were, except for the latter process, not really consumed but in the main returned to the stream for the use of lower settlers. The water in the state thus had to be administered. The "come and take" days were gone. So-called diligence rights furnished no certain fixed or permanent records of appropriations, the lack of which records lent to confusion and strife. Data and records had to be centralized and the distribution controlled and supervised by water masters and stream riders all ultimately centering in a central office. The duty and the power to administer waters in the state was placed in the office of the State Engineer. See my views stated in *Rocky Ford Canal Co.* v. *Cox, J.*, 92 Utah 148, 59 P. 2d 935. All this is well known but I assemble it here for the purpose of giving content in juxtaposition to what I shall say hereunder. If the waters in this state are "public waters" and only use rights in them may be obtained, then the United States, being only entitled to the right to the use, stands in exactly the same position as any citizen or member of the public who has proprietary rights to water use. When the United States obtained water rights as appurtenant to lands to be used for the Deer Creek Reservoir, it obtained title not to the fee but only to the use right in the water. The use right which it ob-

tained was exactly the sort of right and no more than any individual or corporation could attain—a right to use the water beneficially and the basis, the measure and the limit of that right was beneficial use. It obtained by virtue of its sovereignty no different title nor a different right, nor a right with a different content than that possessed by its predecessor. There went with that water use right as part of its content into whosoever hands it came even though it had been obtained by diligence before the advent of the State Engineer's jurisdiction, and as a concomitant thereof, the amenability to regulation as to its appropriation and use, its change of use, its place of use, its point of diversion and change of that point. It follows from the very nature of water rights whether acquired by appropriation through the State Engineer or by diligence, that the state can regulate and supervise distribution among users just as in the case of all natural substances which must be shared by many. Air, for instance, may be subject to regulation and supervision. The state may prevent pollution of air and private waters if it endangers others. If ever we arrive at a time when great masses of air can be moved artificially and it becomes necessary to cleanse the air of radio-active dust and to allocate the pure air to industry or to individuals, we may be certain that such concomitants and incidents necessary or appropriate to the allocation of use rights in air will be imposed and all the apparatus for regulating and controlling them through administration set up, including appeal to established tribunals; that these concomitants including the subjectivity to control will be part and parcel of the right; and the United States in its proprietary right to such use rights or as one entering the chain of title will stand in the same position as any other claimant. The use of each natural element essential to life will be attended by those concomitants which are necessary to its regulation with variations according to its nature dictated by common necessity. *And such attendant regulatory incidents will be part of such use right.* Ofttimes, we fail to follow through with our reasoning. The very nature

of a use right differs from the nature of an ordinary property right. We speak of the physical properties of matter or substance to denote its peculiar and characteristic qualities—as that salt is salty. The root of the word "property" is derived from the Latin word *proprietas* meaning that which is of proper nature to anything—which fits and belongs to it. I think the law borrowed the concept of properties—the characteristics of a physical thing or substance and applied it to an abstraction. The concept of property as a bundle of rights such as the exclusive right to possess, enjoy and dispose of a thing is summed up in the abstraction "ownership" and to this bundle of rights with which the law invested the abstraction it gave the noun form calling it property or something of value, wealth, so that it now means chattels, land or even incorporeal rights. In earlier legal systems, rights pertaining to public or faimily relations were included as property.

Certainly, the United States procured and owns only the particular type of right which was incident to the land it bought. The nature and conditions of the use do not alter with the attributes attending the owner of the right, one of which attributes is, in this case of sovereignty, immunity from suit. The user, whoever it or he may be, has the property in the use right, the content of which is all the characteristics or properties of that use right including the subjectivity to regulation and supervision; one phase of which is the State Engineer's right and duty to reject or accept an application for a change of place of diversion accordingly as he concludes it will interfere with vested rights or not interfere. The United States could do no other because such duty to apply to the State Engineer was an ingredient of the use right which the United States had acquired. It was a part and parcel of the right —a part of its very legal nature. Such content attended the right in the form of a limitation and as a part or ingredient of it throughout regardless of the nature of the owner. The United States, because it was that type of

owner which possessed the attribute of immunity from suit, nevertheless took the water use right in its entirety with all the limitations, characteristics and benefits which were ingredients of the right and which really constituted it. It could no more acquire the right devoid of its subjectivity to regulation than it could buy a lemon devoid of sourness. If it could, it would have acquired a different right and not a water use right.

As a new action for tort created by a state statute carries with it as a concomitant of the right to sue the conditions and limitations for exercising it and with which it is invested when created and which limitations pertain in the tribunals of a sister state as well as in the tribunals of the state which created the right, so does the requirement that the holder of the use right to water submit to regulation which embraces all the apparatus of regulation including appeal procedure which accompanies the use right as a part of it. Hence from what has been said above in respect to the nature of a use right to water, which is the only sort of right one may acquire in our public waters, it must result that the United States could *not* proceed in any matter touching regulation (including submission to court review) otherwise than to "initiate these proceedings" by applying to the State Engineer.

If we do not care to accept this seemingly esoteric concept that the use right itself includes as an integral part of and limitation to it, the obligation to submit to regulation and to all the apparatus, of regulation,—we may perhaps fall back on the less logically sustainable but ordinary concepts which attend property if we but keep in mind the sort of limited property a use right to water is, that is a shared right to a natural resource of the highest necessity. Put in another way, we may think of the subjectivity to regulation as *imposed by law on the right* rather than an integral part or concomitant of that use right.

This concept leads to the same result. When any transferee including the United States acquires property such

as a right, it must accept such property with all the obligations which the law imposes on such ownership and which are necessary to permit enjoyment of it as a shared substance. One of those obligations which is in the very essence of enjoyment of a shared use of fugitive substances is regulation. Without regulation supervision and control, which of course is another name for administration, fugitive substances cannot be shared. I am not sure that the obligation of the United States to submit to control, regulation and supervision applies only to fugitive natural substances because as said before the very characteristic of sharing makes such administration necessary. If I recollect correctly, the states of New Jersey and Maryland own oyster beds. I doubt whether such property is owned by the public which in effect means that they would be free for the taking albeit under regulation. I shall presume they are owned by the state as the corporate entity representing the public and for the benefit of the people or at least the citizens of the state. But the state gives rights in the form of grants, leases or otherwise. The use of the bay bottoms or river mouth bottoms, where oysters may breed and sanitarily grow from planted seeds, must, if used by a number of people, require regulation. If the apparatus of administration embraces the requirement that owners and lessees of the oyster beds submit to court action in the process of settling their disputes which grow out of regulation, I would think that the United States could not, as one owner among many, disrupt the machinery of regulation under the guise that it would not have to submit to suit in court. I opine that a sovereign owner who holds property of whatever nature holds it as to persons subject to the laws designed to regulate the use of that property in respect to *all* owners and in relation to the public generally. Against its sovereign immunity from suit on the one side, stands on the other side the right of another sovereign to regulate the use of its own property as well as the private property of its inhabitants under its police power.

But my thesis that the United States is not immune from suit in our state courts in respect to any matters drawn into the vortex of regulation of waters in the state does not depend on establishing the principle that it is not immune from suit as respect to all types of property which it holds in its proprietary as contrasted with its sovereign capacity when such suits are part of the modus operandi of settling questions arising in respect to the regulation of property. I only need rest my thesis in this case on the proposition that the use right to water contains intrinsically as a part of its very nature and constitution of and as proper to it and as a characteristic of it, as an atom is part of a molecule,—the concept that it is subject to regulation (whether the apparatus of regulation includes submission to administrative bodies, court reviews, or other constitutional means). This for the reason that the rights are shared rights in a fluid and a fugitive natural substance, which requires as a condition of the very existence of such sharing, the obligation that they be subjected to organization and regulation. This may be done by the legislature directly or by an agency set up to administer the public waters of the state or in part by both as the legislature may prescribe.

Even if a party found it necessary to have decided between himself and the United States the matter of claimed vested rights in these waters acquired by the latter as incident to the lands purchased, I am wondering how he would do so except by a suit to quiet title in the state district court where the United States would be a defendant; and how would it be in a general river system adjudication where the United States claimed to own water rights therein in its proprietary capacity? Would the fact that such adjudication takes on the aspect of an adjudication in rem make any difference in view of the fact that all claimants must be brought into the proceedings by such notice as such proceedings permit of in order to satisfy the requirements of due process? Many questions arise not now calling for solution but may be posed to point up the dif-

ficulties of applying the doctrine of sovereign immunity in cases where the United States, acting in its proprietary capacity, urges such doctrine really intended to be a shield only when it acted in its sovereign capacity.

It follows, of course, that I agree with the main opinion in its reiteration of the principle that the scope of the district court on appeal from the Engineer's decision is no wider than the question decided by the Engineer, or at least no wider than the matters at issue which he could and should have decided. The question to be decided by the district court is the same as presented to the Engineer although different or more evidence on the issue may be adduced.

Since the district court in reviewing the Engineer's decision acts only derivatively and can act only in that way, it of course would require a decision of the Engineer before the district court could take cognizance of the appeal. Hence, the United States, if the Engineer's decision had been the other way, would have been quick to assert that it was entitled to a review of that decision and that the only way it could get into the court was by appeal from the State Engineer's decision. The effect of the Engineer's administrative ruling was to set the scene for a judicial review of the narrow question presented to the Engineer. In a sense, the court is thus auxiliary to the administration agency. It is as if the court were acting as a special review body for the administration agency.

The phrase "plenary review" when coupled with the right of a trial de novo must mean a full review of both fact and law questions involved in the decision of the Engineer or the issues raised before him in respect to which the appeal court, as stated by the main opinion, could adduce new, different or additional evidence within the confines of the issues as framed before the Engineer and not outside of them. I should think, however, that it would be a corollary to what has been said above that the power of the

district court to modify the State Engineer's decision if it existed at all would be a narrow one and modification could be made only within the issues raised before the State Engineer. In my dissenting opinion in the case of *Rocky Ford Irr. Co.* v. *Cox, J.*, supra, I treated this matter of the exclusive right of the State Engineer to administer the waters of the state without interference by the court even while they were under general adjudication. I refer the reader to that opinion.

I concur in the statements that neither the decision of the State Engineer nor the decision of the district court on appeal determines priorities because the very substance of vested rights to the use of water depends on the amount of water appropriated and priorities. The time and period when an appropriator may take his water in respect to times other appropriators may take theirs may be as vital a factor in determining how much water an appropriator may actually use as is the amount named in his certificate of appropriation.

As I read the original decision, it does not attempt to define a vested right as used in water law nor specify how they may arise. I assume that it is not meant to intimate that vested rights could only arise by judicial decree nor that they might not in certain instances have their origin in a decision of the State Engineer. It was noted in the original decision that

"The State Engineer's decisions [though administrative in nature and purpose], often have the effect of determining valuable rights." [238 P. 2d 1134.]

And as further noted

"Such decisions are declared final unless reversed by a review in the district court".

I suppose a valuable right is not necessarily a vested right—which I assume to be a fixed and permanent right in a certain person or persons, association or corporation

the Engineer permits a change in the point of diversion subject to vested rights, I would suppose that "vested rights" might include the rights gained by a decision of the State Engineer as respects a change of point of diversion, place or nature of use, which had become final because there were no objections or if so, the objections had been overruled and not appealed from or if appealed from had been affirmed by the district court and not overturned by the Supreme Court. It may be that even then a decision allowing a change of place of use or diversion or nature of use might be only prima facie evidence of the right to retain benefit of such rulings and be subject to be upset in a suit to quiet title or by a river or system adjudication where a decree would seemingly set at rest priorities and extent of appropriations at least between or among parties to the litigation. However, until that came about it appears to me that any ruling by the State Engineer which he had previously made decreeing an appropriation (evidenced by a certificate) or allowing on application changes in the point of diversion, place and nature of use in regard to other users in the particular stream or system and which had not on appeal been disturbed, must be considered as "vested rights" for the purpose of the phrase "subject to vested rights" contained in subsequent rulings of the State Engineer. And I suppose even naked approval of application to appropriate under which water is taken for a long time without objection even though it was not followed up with an application to prove up or the acquisition of a certificate of appropriation in pursuance of proof, might fall under that category as far as the term "subject to vested rights" is concerned when used in an order subsequently allowing a change of diversion or use.

It is not necessary in characterizing the powers of the State Engineer to determine which of his powers are legislative, executive or judicial. In my earlier years on this bench, I had occasion to examine several times at length,

and I hope with depth, into the nature of legislative, executive and judicial functions and powers and so-called administrative functions. I do not think I shall ever be able to improve on the study I made in this regard in the case of *Tite* v. *State Tax Commission,* 89 Utah 404, 57 P. 2d 734. This court there speaking through me called attention to the fact that those functions are judicial which have been traditionally exercised by the courts in adversary proceedings; that the function of incidental judging is a part of legislative and executive action as well, as it is indeed a part of human activity generally, but when exercised by a court in traditional fashion it is a judicial function as meant in the separation of powers requirement. It was also there noted that the same issue or question could have judicial and administrative aspects: The question, for instance, of whether a doctor committed an abortion might come up before the Medical Board administratively in a determination of the doctor's fitness to retain his medical license. It might come up again in a determination as to whether the doctor committed a crime. The doctrines of DeToqueville and Montesquieu regarding rigid separation of powers became ingrafted in our early American systems of government but strictly construed and observed they would make modern government unworkable. I have believed that the necessity for administrative agencies to exercise functions which are in essence largely an admixture of what may be basically legislative, executive and judicial powers or any two of them has led to calling these hybrid powers administrative, and by not too closely scrutinizing the mixture and attempting to refine them into their essential elements which cannot in any event be done, we avoid the vexed question of separation of powers. I do not believe that the State Engineer acts judicially in his administration of the waters in the state —certainly not in the respect in which judicial powers are traditionally exercised; hence, I do not see that there is any problem of keeping the judicial in his action separate from the other phases of his work because he exercised no

judicial power in its traditional sense. His rulings, like those of the Industrial Commission, may in some cases be characterized as quasi-judicial. All the functions he exercises are merged into an overall power known as administrative.

CROCKETT, J., concurs in denying the rehearing.