367 P.2d 855

**PIUTE RESERVOIR & IRRIGATION COMPANY, Deseret Irrigation Company, et al., Plaintiffs and Appellants,**

v.

**WEST PANGUITCH IRRIGATION & RESERVOIR COMPANY, State of Utah and Wayne D. Criddle, State Engineer of the State of Utah, Defendants and Respondents.**

No. 9411.

Supreme Court of Utah.

Jan. 9, 1962.

Marr, Wilkins & Cannon, Richard H. Nebeker, Salt Lake City, Sam Cline, Milford, Thorpe Waddingham, Delta, Olsen & Chamberlain, Richfield, for appellants.

McKay & Burton, Henry D. Moyle, Salt Lake City, Walter L. Budge, Atty. Gen., Richard R. Boyle, Dallin W. Jensen, Asst. Attys. Gen., for respondents.

WADE, Chief Justice.

We granted a rehearing on this appeal by plaintiffs, Piute Reservoir & Irrigation Company and the other lower water users of the Sevier River, from the conditional allowance of defendant, West Panguitch Irrigation & Reservoir Company's application to change the use of 700 acre feet of winter water of Panguitch Creek to reservoir storage until the dry summer season, then to be used to supplement the watering of land already under irrigation from that creek. The Cox Decree awarded appellant, West Panguitch, the entire above-ground flow of Panguitch Creek, a tributary of the Sevier River. However, only occasionally during unusual floods or high water is there any above-ground flow of water from this creek which reaches the Sevier River. The waters sought to be stored are presently diverted during the winter into the West Panguitch Canals for culinary, stock watering and ground-flooding purposes.

In our former opinion [1] we approved the application concluding that the evidence would reasonably justify a finding of rea-

1. For more complete statement see Piute Reservoir & Irr. Co. v. West Panguitch Irr. & Res. Co., 12 Utah 2d 168, 364 P.2d 113.

**8**

son to believe that the winter water could be stored until the dry summer season and then used to supplement the watering of applicant's presently irrigated lands without depriving the lower water users of any waters of the Sevier River which would have reached the Piute Reservoir without the change. We emphasized this as the condition on which the approval was based and we did not approve the statement in the Engineer's decision that there could be a "de minimus" decrease of the water reaching the lower users "with which the courts will not be concerned." In other words, while we approved the application, we definitely held that the change should not be allowed to operate without affirmative proof that the rights of the lower water users of the Sevier River were not thereby impaired.

■ Does the evidence show reason to believe that the winter waters now used for culinary, stock watering and land flooding can be stored in a reservoir to be built until the dry summer season, then used to supplement watering of the presently irrigated land without depriving lower water users of the Sevier River of the use of some quantity of water during the same period of time as would have been available to them without the change? Without such a showing this application should be denied. For if the operation of such a change will deprive the lower users of the same quantity of water during the same period of time as they would have had without this change, their vested rights will thereby be impaired.[2] So this is the determinative question to be considered on this appeal.

The lands irrigated in the summer and flooded in the winter by water from Panguitch Creek consist of a strip bordering the west side of the Sevier River for about eight miles. The south end of this strip, where the city of Panguitch is located, is about five miles wide, but down stream to the north it is only three to two miles wide. All of this strip definitely slopes toward the river. There were practically no measurements of the amount of water passing through this area either in the Sevier River or Panguitch Creek introduced in evidence. However, there was some evidence of the amount of the flow of the winter waters of Panguitch Creek, and during the trial appellants made measurements of the flow of water in the Sevier River at the upper and lower ends of this area. These measurements show that on June 21, 1960, there was a flow of one cubic foot per second at the upper end of this strip and an increase to 17 cubic feet per second near the lower end

2. See Sec. 73-3-3, U.C.A.1953, and cases cited in Provo Bench Canal & Irrigation Co. v. Linke, 5 Utah 2d 53, 296 P.2d 723, note 1 thereof. Also East Bench Irrigation Co. v. State, same case as first case cited in above note after retrial, 5 Utah 2d 235, 300 P.2d 603; Little Cottonwood Water Co. v. Sandy City, 123 Utah 242, 258 P.2d 440.

of this area. This shows an increase by underground flow of 16 cubic feet per second within less than eight miles. The lands on the east side of the Sevier River are also irrigated so part of this increased flow would probably come from that side. This increase definitely indicates that the waters from Panguitch Creek, which is used for winter flooding, would produce a substantial underground flow into the Sevier River. That is especially true of winter flooding when on account of cold weather and lack of plant growth there would be little water consumption from evaporation or plant transpiration. It is also evidence that most of this underground flow into the Sevier River during the winter would reach the Piute Reservoir where it would be available for the protesting lower water users below, since, during that time the nearly tight diverting dams between Panguitch and Piute Reservoir would not be diverting all of the winter flow of water in that river.

After a careful restudy of the record we find definite evidence that the proposed change would decrease the amount of winter water available for storage and use in and below the Piute Reservoir by the protesting plaintiffs. Further, we have been unable to find any evidence in the record to the contrary. Most of the evidence on this question was by Deputy State Engineer Lambert, who testified that he participated with the State Engineer and the Attorney General's Office in approving the application.

Much of Lambert's testimony dealt with clarifying a statement in the Engineer's decision, "that the effect on lower direct flow users of the changes here proposed reaches the 'de minimus' with which the courts will not be concerned." After apparently suggesting a number of much greater amounts he seems to conclude that a loss of 10 acre feet to the lower water users would be more than the so-called de minimus amount with which the courts will not be concerned and should require that this application be not allowed.

Lambert discussed a number of items which would affect the amount of the probable loss to the lower users. Under one such item he arrived at a loss of as little as 55 acre feet plus, which amount, he stated, was a comparatively small amount. Later he expressed the opinion that the return flow in any area is considerable, especially where the land is close to the river. He seems to conclude at this point that a very intelligent guess would place the return flow of this winter flooding water at 400 acre feet out of the 700 acre feet which would be stored under this change.

He emphasized that in the winter months there would be practically no consumption, even though the water was spread out on the land; but if the water was released in January, or February, the return flow would move rapidly and reach the Piute Reservoir. Whereas, if the same quantity were released

in June, July and August, the return flow would go to fulfill primary rights of the canal owners between Panguitch and the Piute Reservoir and be lost to the lower users. He however stated that the return flow from the winter flooding would be decreased if the stream which was diverted from Panguitch Creek were divided between two or three ditches.

The evidence most favorable to showing that the proposed change could be operated without decreasing the quantity of water available for the lower users or changing the time when it would reach the Piute Reservoir are what Lambert called geological. He testified that the Panguitch Creek area waters are predominantly from volcanics with unusual characteristics. He further testified that the main Sevier River above Panguitch has some volcanics, but a lot of its runoff is from red clay areas; that the runoff from the Panguitch area may actually in its alluvial fan or deposit at the mouth of Panguitch Canyon, be sealed off from the Sevier River by volcanic rock supplemented by clay and mud washed down from the Sevier River and thus prevent most of the winter flood waters from reaching the Sevier River. It seems that this probably was the basis for his previous estimate of an underground flow into the Sevier River from the winter flooding of as little as 55 acre feet plus, although he made no direct statement to that effect. He definitely stated that he did not know that such sealing off condition exists and refused to venture an opinion thereon, stating that it would require a tremendous study which has not been made, to determine that question. He merely suggested the possibility that a tremendous study might disclose such a condition under which the loss from the change might be small.

■ This court has never adopted the so-called "de minimus" theory, which we understand to be that an application either to appropriate or change the diversion or use of water should be approved if the effect on prior vested rights is so small that courts will not be concerned therewith. This would seem to require the approval of an application if it were shown that the adverse effect on vested rights is very small, even though there is a definite showing of some such adverse effect. Of course, all of the estimates of the loss to the lower users by Mr. Lambert were many times more than the amount he estimated as being a "de minimus" amount of loss to the lower water users. However, the correct rule on this question is that the applicant must shown reason to believe that the proposed application for change can be made without impairing vested rights.[3] This means that if vested rights will be impaired by such change or application to appropriate, such application should not be approved.

3. See note 2.

The foregoing conclusion is especially applicable under the situation here disclosed; that a long river drains the water from many canyons covering a large territory over which there is an inadequate water supply to fully irrigate the land presently under cultivation and where the tributary water of many such canyons could be stored and used to supplement the irrigation of presently irrigated lands during the dry season to great advantage to the landowners who would receive advantages of the supplemental irrigation water. If a "de minimus" reduction of the waters available to the lower water users were allowed under such conditions over and over again, the damage to the lower users would be unbearable.

Application denied with costs to appellant.

HENRIOD, McDONOUGH and CALLISTER, JJ., concur.

CROCKETT, Justice (dissenting).

I prefer to stand upon the decision of this court as originally announced.[1] It affirmed the judgment of the trial court, which in turn upheld the action of the State Engineer in approving respondents' application to construct a reservoir to store water adjudicated to it in the Cox Decree of 1936 and which they have owned and used ever since.

In considering respondents' rights, these salient facts should be kept in mind: that the Cox Decree above referred to awarded them all of the flow of the Panguitch Creek for the entire year; that the waters of Panguitch Creek have for many years been cut off by a tight dam which has diverted the waters from the creek the year around: in the summer for irrigation and in the winter for flooding, stock watering and domestic purposes; that there is no direct return flow of the waters diverted from the creek either back into the creek or into the Sevier River (except in very unusual conditions of flooding); that the original application was to store 5,600 acre feet of winter water which was reduced to not to exceed 700 acre feet, that being the estimated amount that Panguitch Creek would make during the winter months, for the purpose of storing this water so that it could be used to a better purpose during the spring and summer months when it was needed to irrigate growing crops.

I fully appreciate the importance of preserving the established water rights of lower users and that caution should be taken not to permit upper users to encroach thereon. The latter are in a position of physical advantage so they may, if permitted to do so, whittle away the lower users' rights to the extent of any such encroachment. However, it is equally important to keep in mind that the upper

---

1. See footnote 1 of main opinion.

users also have rights which must be safe-guarded. Our decisions dealing with disputes over rights to the use of water are replete with statements about how important, and even precious, water is in this arid area, and that it is the policy of the law not only to permit, but to encourage the taking of any measures to develop, conserve, and put water resources to the best possible use and in the most economical manner feasible. That the appropriator of water should be allowed wide latitude in putting it to whatever use best suits his purpose is indicated in McNaughton v. Eaton, 121 Utah 394, 242 P.2d 570, at 574, "[he] * * * may sell or transfer the right to use of such waters * * * or * * * may recapture and use them for further beneficial use if he does so before they get beyond his property and control," citing other of our decisions so holding.

It is so patent as to not admit of argument that no one should be compelled to use his water in a wasteful or inefficient way for the purpose of furnishing waste or seepage water for the benefit of others; and that no one can thus acquire rights to waste or seepage waters. See Eden Irr. Co. v. District Court, 61 Utah 103, 211 P. 957; Garns v. Rollins, 41 Utah 260, 125 P. 867; Big Cottonwood Tanner Ditch Co. v. Moyle, et al., 109 Utah 213, 174 P.2d 148, 172 A.L.R. 175.

Our prior decision advisedly indicated that the approval of respondents' application could be sustained only because the State Engineer had discreetly placed these limitations thereon: that the change in the manner of the use of the waters could be made only if it did not impair existing rights of lower users; that no new land could be brought under cultivation; that plans and specifications so demonstrating had to be submitted to and approved by the State Engineer; and that measuring devices also had to be installed by respondents as required by the State Engineer. The judgment of the district court also expressly included those same restrictions. It seems to follow the general pattern suggested in the case of East Bench Irrigation Co.[2]

The judgment below and our former decision adequately assured against encroachments on the lower users' rights. Under them the respondents as the moving parties would have the burden of showing by a preponderance of the evidence that they had met the foregoing conditions and that the proposed change could be made without impairing the vested rights of the lower users before they could build the proposed dam. In addition to safeguarding those rights it also allowed the respondents the opportunity of making better and more efficient use of their waters if that could be done without infringing upon the rights of

2. Cited in footnote 2 of main opinion.

others. It seems to me that resolving this controversy upon that basis, which would recognize the rights of both disputants, would be more sound and salutary than doing so upon the foundation upon which this second opinion is based.