Mrs. Dudley CRAFTS, et al., Plaintiffs and Appellants,

v.

Dee C. HANSEN, State Engineer of Utah; Intermountain Power Project; et al., Defendants and Respondents.

Mrs. Dudley CRAFTS, et al., Plaintiffs and Appellants,

v.

Dee C. HANSEN, State Engineer of the State of Utah, et al., Defendants and Respondents.

Bernard JACKSON, et al., Plaintiffs and Appellants,

v.

Dr. Clark COX, et al., Defendants and Respondents.

Ray BROWN, et al., Plaintiffs and Appellants,

v.

Dee C. HANSEN, State Engineer of the State of Utah, et al., Defendants and Respondents.

Gerald MOODY, et al., Plaintiffs and Appellants,

v.

CENTRAL UTAH WATER ·COMPANY, et al., Defendants and Respondents.

Nos. 18053 to 18057.

Supreme Court of Utah.

June 14, 1983. ·

---

sultation with the client is impossible. *E.g., Nehleber v. Anzalone,* Fla.App., 345 So.2d 822 (1977).

E.J. Skeen, Salt Lake City, for plaintiffs and appellants.

David L. Wilkinson, Atty. Gen., Dallin W. Jensen, Michael M. Quealy, Asst. Attys. Gen., Joseph Novak, Wayne L. Black, Robert D. Moore, Salt Lake City, Thorpe A. Waddingham, Delta, Edward W. Clyde, Salt Lake City, for defendants and respondents.

DURHAM, Justice:

This appeal involves five lawsuits which have been consolidated and which were filed in the district court by the appellants pursuant to U.C.A., 1953, § 73–3–14, to seek review of the decisions of the Utah State Engineer which approved various change applications. Although each lawsuit involves separate change applications, all of the cases raise common questions. The trial court granted the Utah State respondents' motions for partial summary judgment in all five cases, and later granted motions for summary judgment made by the remaining corporate and individual respondents. The orders of the trial court are essentially identical in each case and they affirm the decisions of the State Engineer approving the change applications. The sole issue on appeal is whether there are genuine issues of material fact which preclude summary judgment. *See* Utah R.Civ.P. 56. We conclude that there are, and we reverse and remand all five cases for trial.

The factual context of this dispute is as follows: A group of shareholders in five Utah corporations [1] and a group of water well owners in Millard County, Utah, formed a joint venture for the purpose of selling 45,000 acre feet of water to the

---

1. Delta Canal Company, Melville Irrigation Company, Abraham Irrigation Company, Deseret Irrigation Company, and Central Utah Water Company. The first four companies will be referred to collectively in this opinion as the "DMAD companies."

Intermountain Power Agency (hereafter "IPA"), a political subdivision of the State of Utah. The water is intended for use in the construction and operation of the Intermountain Power Project (hereafter "IPP") in Millard County. Contracts for the sale of the water were executed and the change applications which are the subject of these lawsuits were filed with the State Engineer in September and October of 1979.

The change applications in four of these lawsuits were filed by the owners of the water rights to change the permitted use of the water from its historical irrigation and stockwatering uses to industrial and domestic uses in connection with the proposed IPP. The fifth lawsuit, *Brown v. Hansen*, No. 18056, concerns a change application which seeks an amendment of the water rights to conform to proofs of appropriation which differed from the original applications. All of the change applications were advertised as required by law and were protested by various individuals and organizations. Following the necessary administrative hearings, the State Engineer approved each of the applications, subject to certain conditions and limitations which were intended to protect the vested rights of others in the geographical areas in question. Thereafter, the appellants in these five cases filed complaints in district court for review of the State Engineer's decisions. After discovery, the respondents filed their motions for summary judgment.

In each case, the respondents filed affidavits in support of their motions for summary judgment. The affidavits were prepared in each case by a civil engineer named Reed W. Mower and, in cases Nos. 18053, 18054 & 18057, by the then Sevier River Commissioner, Roger Walker. Opposing affidavits were filed in each case by the appellants from another civil engineer, Parley R. Neeley. These documents will be referred to hereafter as the "Mower affidavits," the "Walker affidavits," and the "Neeley affidavits." The trial court granted summary judgment based on the change applications, the decisions of the State Engineer, and the contents of the Mower, Walker, and Neeley affidavits. The central issue before this Court is whether any genuine issue of material fact is raised by the affidavits of the parties' respective experts.

■ ■ The statutes governing these actions, U.C.A., 1953, §§ 73–3–14 & –15, specify that a party aggrieved by a decision of the State Engineer is entitled to "plenary review" in the district court, and that "[t]he hearing in the district court shall proceed as a trial de novo and shall be tried to the court as other equitable actions." The issues at such hearings are, however, strictly limited to those which were, or could have been, raised before the State Engineer. *See, e.g., East Bench Irrigation Co. v. State*, 5 Utah 2d 235, 300 P.2d 603 (1956). U.C.A., 1953, § 73–3–3 provides in pertinent part:

> Any person entitled to the use of water may change the place of diversion or use and may use the water for other purposes than those for which it was originally appropriated, but no such change shall be made if it impairs any vested right without just compensation.

Thus, it is the State Engineer's obligation, before approving a change application, to determine that no vested water right will be impaired by the proposed change. On plenary review, the trial court has the same obligation. This Court has described the standard for that determination as follows:

> If the evidence shows that there is reason to believe that the proposed change can be made without impairing vested rights the application should be approved. The owner of a water right has a vested right to the quality as well as the quantity which he has beneficially used. A change application cannot be rejected without a showing that vested rights will thereby be substantially impaired. While the applicant has the general burden of showing that no impairment of vested rights will result from the change, the person opposing such application must fail if the evidence does not disclose that his rights will be impaired.

*Salt Lake City v. Boundary Springs Water Users Ass'n*, 2 Utah 2d 141, 143–44, 270 P.2d 453, 455 (1954) (citations omitted).

The question which must be decided in these cases is: Do the affidavits raise a genuine issue of material fact as to whether there is reason to believe that the proposed changes can be made without impairing vested water rights? If legitimate questions on that issue are raised by the affidavits, the cases must be remanded for a trial on their merits.[2] Preliminary to our analysis of the affidavits, we note that all of them have one feature in common. For the most part, they recite expressions of expert opinion rather than factual data and the factual data upon which the opinions are based is either not set forth at all or only to a very limited extent. Because the contents of the affidavits filed in each of these five cases vary somewhat, we will discuss them separately and in detail.

## I.

### Crafts v. Intermountain Power Project, No. 18053

■ The change application in this case, No. a–10864, requested changes of usage of the DMAD companies' Sevier River direct flow and storage water rights to permit industrial use at the IPP. The pleadings raise the following issues of fact: 1) whether the proposed changes will interfere with and damage the appellants' vested water rights, 2) whether it will result in an enlargement of the right sought to be changed, and 3) whether 27,000 acre feet, the approximate amount of water which will be pumped under the proposed change, has ever been pumped from the DMAD wells involved in the change application.

There are three affidavits in the record in this case—the Mower and Walker affidavits filed by the respondents, and the Neeley affidavit filed by the appellants. The Mower affidavit is directed exclusively to Change Application No. a–18064, which is the subject of this particular lawsuit. The Walker affidavit offers opinion testimony on three Change Applications, Nos. a–10863, a–10864 and a–10927. The effects of Change Applications Nos. a–10863 and a–10864 are treated jointly. The Neeley affidavit is identical to the ones filed in each of the five lawsuits consolidated in this appeal and is directed only in general terms to Change Application No. a–10864. It does not respond directly to the specific allegations of the Mower and Walker affidavits regarding this change application, but does challenge their conclusions in certain particulars pertinent to the change application. Because a careful comparison of their language is necessary in determining whether the affidavits raise genuine issues of material fact, we set forth relevant portions at some length below. We note that the experience, background and training recited in the Mower and Neeley affidavits constitute prima facie evidence that each is qualified to give an expert opinion as a civil engineer and hydrologist. Likewise, Walker, although not an engineer, establishes in his affidavit sufficient training and experience to permit an expression of expert opinion. There is no basis in the affidavits themselves for distinguishing between any of the affiants based upon professional qualifications, except for the fact that Neeley and Mower are professional engineers and Walker a layman with considerable experi-

---

**2.** The dissenting opinion suggests that where the issue is "reason to believe," the existence of contradictory evidence is irrelevant. If that were so, then the statute providing for judicial review of "any case where a decision of the state engineer is involved" would not apply whenever said decision depends on a "reason to believe" standard. No such exception is contained in the statute. The cases cited by this opinion, the dissent, and the parties in their briefs all involved adjudications of the "reason to believe" question. Thus the dissent is mistaken in arguing that this opinion overrules the "reason to believe" standard. It is also mistak-

en in suggesting that the trial court must automatically affirm the State Engineer by summary judgment whenever that standard is invoked, regardless of the production of evidence which controverts the existence of "reason to believe." The dissent ignores the applicable law relating to summary judgment. The threshold determination on summary judgment is always whether there is a genuine issue of material fact. If there is, no party is entitled to judgment as a matter of law. This fundamental premise is not vitiated by the nature of the issues in the lawsuit.

ence in water measurement and administration.

The Mower affidavit sets forth the following opinion:

13. That the only section of the natural channel of the Sevier River which contributes to the natural recharge into the artesian aquifers [3] in the Sevier Desert ground-water basin is located in Leamington Canyon for a distance of approximately 3½ miles situated between a point approximately 200 feet upstream from the Central Utah Water Company diversion dam and a point approximately ¼ mile upstream from the Sevier River crossing with the west line of Section 1, T. 15 S., R. 4 W., SLB & M.

14. That the proposed changes under Change Application No. a–10864 (68 Area) will not reduce the natural recharge into the artesian aquifers of the Sevier Desert ground-water basin from the waters flowing in the Sevier River since the rate at which the said approximately 3½ miles of Sevier River stream channel contributes to such natural recharge is a function of the wetted perimeter of the stream channel and the increase in the wetted perimeter thereof during the non-irrigation season under the proposed change will more than offset any decrease in the wetted perimeter thereof during the irrigation season.

15. That the canal systems of the DMAD Companies and the lands irrigated thereunder are situated more than 15 miles downstream from the only section of the Sevier River which naturally recharges the artesian aquifers in the Sevier Desert ground-water basin referred to in paragraph 13 hereinabove and are situated in an area in which there is no natural recharge into the artesian aquifers in the Sevier Desert ground-water basin.

16. That none of the waters diverted into the canal systems of the DMAD Companies and used to irrigate the lands thereunder recharges the artesian aqui-

fers which are the sole sources of water diverted by means of wells in the Sevier Desert ground-water basin. The basis for the foregoing opinion is that the canal systems of the DMAD Companies and the lands irrigated thereunder are underlain with a thick layer of impervious clay which constitutes a barrier to the movement of water from the ground surface into the underlying artesian aquifers.

The Walker affidavit recites:

21. . . . .

(b) That true and correct copies of Memorandum Decisions each dated March 25, 1980, issued by the Utah State Engineer after hearings held on Change Application Nos. a–10863, now the subject of appeal as evidenced by Civil No. 7140, and a–10864, now the subject of appeal as evidenced by Civil No. 7145, are attached hereto and incorporated by reference as a part hereof; that it is my considered opinion that said two (2) Memorandum Decisions will, after the changes provided for therein and placed into effect, result in the following benefits to the public generally and/or Central Utah Water Company, Delta Canal Company, Melville Irrigation Company, Abraham Irrigation Company and Deseret Irrigation Company . . . .

There follows a detailed description in thirteen paragraphs of said benefits, including elimination of seepage and evaporation loss of storage water, improvements in the quality of available water for agricultural and recreational uses, more efficient use of annual water supplies by water users in the area, and economic benefits to the DMAD companies' stockholders. The summary of projected benefits ends with this conclusion:

14. That it is my considered opinion that the benefits, as set forth in this affidavit, which will accrue to approximately eighty percent (80%) of the shares of stock of the DMAD companies, which were not sold to IPA, if the three attached Memorandum Decisions of the

---

**3.** Webster's Third New International Dictionary at 108 (1961) defines "aquifer" as: "a water-bearing bed or stratum of permeable rock, sand, or gravel capable of yielding considerable quantities of water to wells or springs."

Utah State Engineer are affirmed by the District Court, are more than adequate to fully compensate any and all other water users for any damages, if any there be, which might result from the affirming of such Memorandum Decisions by the District Court; and, further, it is my considered opinion that the benefits resulting to the public generally from so doing as heretofore stated in this affidavit are substantial with no offsetting negative impact to the public.

The opinions set forth in the Neeley affidavit differ sharply, although only the general allegations of the affidavit are directed to the direct flow and storage rights which are the subject of the change application in this case. Most of the specific allegations in the Neeley affidavit are directed to the effects of pumping underground water pursuant to the change applications in the other lawsuits involved in this appeal. Those paragraphs which are relevant to this case are as follows:

10. That the affiant was employed by the plaintiffs in this case in July, 1980 to undertake an independent, professional study and conclude the effects of certain proposals to change the regimen of the water supply of the Sevier Desert area, and the Utah State Engineer's determination and testimonies [sic] of parties appearing at hearings conducted by the Utah State Engineer.

11. The affiant has studied and has evaluated certain U.S.G.S. water supply reports relative and relating to the water supply in the Sevier Desert as used in the State Engineer's hearings, also some reports relating to the Sevier River and Desert area, U.S.G.S. manuals, procedures and State Engineer's reports and other data.

12. The affiant states that at this juncture there can be no intelligent assessment of the effects on the Sevier River Desert Water supply.

13. The affiant further states that there can be no intelligent evaluation of the effects of the proposed proposal by the IPA Company until the present study

by the U.S.G.S. under the sponsorship of the Utah State Engineer is completed and [sic] as programmed for 1981.

14. That the affiant has been unable [to] determine as to where and how the State Engineer could obtain data of a character sufficient to approve the changing of applications based upon such fragmental data as is available at the present time.

15. In the course of the following discussions, the affiant will briefly point out differences, overlapping and what appears to be irresponsible conclusions as based upon non-conclusive data. In otherwords, pure guesswork. [sic]

16. It is the opinion of your affiant after reviewing the decisions of the State Engineer in cases numbered 7131, 7140, 7144, 7145 and 7146, copies of which decisions are attached to the complaints herein, and after reviewing the affidavit of Reed Mower, the affidavit of Roger Walker, and based upon his own independent knowledge, together with a review of material made available through the discovery processes so far undertaken in this litigation, that the facts set out in the affidavits filed in these cases are in dispute as follows:

17. Generally the data on which Reed Mower relies is incomplete data and out-of-date data, it having been gathered earlier than 1964, or in the alternative, it consists of studies and testing which does [sic] not adequately reflect the status of the Sevier Desert Groundwater Basin on this date.

18. That there is currently an on-going study by the United States Geological Survey to determine further characteristics and answer questions which are attempted to be answered by the affiant Mower, which study will be completed within the next year to year and one-half. Without the data obtained by such study, said conclusions cannot be accurately drawn about the Basin.

19. That the conclusions of the affiant Mower are largely conjectural and are not based on sufficient information and

are not susceptible to being tested by affidavit.

20. The conclusions of the affiant Walker are simply those of a layman, not based on any scientific knowledge, discussion, data or facts, nor grounded in any conclusions of fact from such reputable scientific source.

. . . .

33. That your affiant knows there is an on-going study being conducted by Mr. Walter Holmes of the U.S.G.S. and that such information as is being gathered by [sic] the subject basin by the U.S.G.S. is indispensible [sic] in answering the questions which Mr. Mower attempts to answer. That further information from the U.S.G.S. study and other independent studies is necessary to determine, with any degree of factual and scientific certainty, the conclusions which Mr. Mower attempts to make. Therefore, said conclusions are highly questionable and likely to be inaccurate.

It may be seen that the affidavits relied on by the respondents essentially set forth the opinion of their experts that the result of approving Change Application No. a–10864 will be either negligible or entirely and dramatically beneficial to other vested water rights in the geographical area and to the public. The appellants' expert witness testifies by affidavit that those opinions are based on out-of-date and inaccurate data and are conjectural, questionable, and probably inaccurate. Further, Neeley's affidavit gives his opinion that the opinions offered by Mower and Walker could not be formed with any degree of factual or scientific certainty on the basis of then available information.

## II.

### Crafts v. Hansen, No. 18054

This case involves Change Application No. a–10863 requesting a permanent change in the point of rediversion, place, and nature of use of a number of the DMAD companies' wells. The pleadings of the appellants claim, among other things, that approval of the change will impose on

nonindustrial users the entire "shrink" or water loss in the irrigation systems involved, encroach on the supply of irrigation water, deprive downstream water users of return flow water, result in an unlawful enlargement of the rights of the applicants, and impair vested rights held by the appellants. It is also alleged that the State Engineer's decision to approve is premised on a nonexistent quantity of water. In this case, the pertinent portions of the affidavits from Mower, Walker and Neeley are as follows:

The Mower affidavit states that, in Mower's opinion, the long-term net effect of the change on the water levels in the Sevier Desert ground-water basin will be negligible because no differences will result from year-round pumping as opposed to seasonal use. Mower also claims that the short-term effect on the water levels in the Sevier Desert ground-water basin wells will be lessened by diverting the same quantity of water annually from the DMAD companies' wells in smaller monthly amounts than is now being done seasonally in larger monthly amounts. Mower further opines that the combined net effect of the change on the ground-water basin as a whole will be "less adverse than the combined net effect . . . which will result from pumping water . . . solely for agricultural uses." The affidavit sets forth the results of Mower's calculations concerning this combined net effect for various geographical areas within the Sevier River ground-water basin. The affidavit also discusses the effect of the location of the wells, the geography of the respective areas, and such factors as the diversion rate and the "transmissivity" of the area. The final paragraph states:

24. That based upon his education, training, studies and experience as set forth above, and his knowledge of the geology and hydrology of the Sevier Desert ground-water basin, it is the opinion of affiant that the combined net effect on the Sevier Desert ground-water basin as a whole, which will result from pumping water by means of the DMAD wells under the proposed changes covered by

Change Application Nos. a–10862 (65–475) and a–10863 (65–475) and by means of the proposed IPP wells under the proposed changes covered by the 12 individual well change applications identified in paragraph 12 hereinabove, will be an increase in the water levels in the Sevier Desert ground-water basin as a whole, except for that part of said ground-water basin in the vicinity of the proposed IPP wells, as compared with the water levels in the Sevier Desert ground-water basin as a whole, which will result from pumping water by means of the DMAD wells and the said 12 individual wells solely for agricultural purposes. The bases [sic] for the foregoing opinion are set forth under paragraphs 15 through 23 hereinabove.

The Walker affidavit in this case is identical to the one filed in *Crafts v. IPP,* No. 18053, discussed above.

There are two Neeley affidavits in this case. The first is identical to the one filed in *Crafts v. IPP* and is discussed above. However, in this case its allegations are directed specifically to the claims made in the Mower affidavit. In addition to those portions of the Neeley affidavit already set forth heretofore, the following specific statements appear:

21. That specifically, and with respect to paragraph 13 of the affidavit of Reed Mower, his conclusions are questionable and likely inaccurate for the reasons that year-around [sic] pumping will create a greater loss than pumping allowed under current conditions because there will be an increased evapo-transpiration, increased evaporation loss, increased seepage together with channel losses from freezing, all of which results in a net loss greater than would be the case if pumped only as is seasonally required.

22. With respect to paragraph 14 of the Mower affidavit, the conclusions are highly suspect in that they do not take into account the movement of water in the underground aquifer; the pumping of IPP wells and DMAD wells will drastically affect the water level, adversely in the Sugarville area, much more than pumping the wells at the original locations and for the original purposes.

That more water will be pumped than ever pumped for agricultural purposes from the DMAD wells and the 12 individual wells. By transferring water from agricultural purposes to the purposes and at the locations allowed by the decisions of the State Engineer, all other wells in the Basin will be adversely affected.

23. With respect to paragraph 15 of Mower's affidavit, there is not sufficient information of any type to determine whether the water level will be raised, rather, pumping in any given basin generally lowers water levels.

Looking at the State Engineer's conclusions, your affiant alleges that they are made from insufficient data, out-of-date data and involve assumptions that are questionable.

24. With respect to paragraph 16 of Mower's affidavit, there is not sufficient information of any type to determine whether the water level will be raised, rather, pumping in any given basin generally lowers water levels.

Looking at the State Engineer's conclusions, you [sic] affiant alleges that they are made from insufficient data, out-of-date data and involve assumptions that are questionable.

Further, the conclusions of Mr. Mower will create an artesian basin which will not occur. [sic] The water has never been pumped initially and is already in the basin. Mr. Mower's conclusions are based on a .40 foot retention that does not apply in the case of these twelve wells. Further, Mr. Mower's conclusions about transmissibility are wrong since the twelve wells are farther physically from the IPP site and they are in the same general valley make-up of water-bearing soils and the average distance of said wells is not affected by a difference in transmissibility because of the general similarity of materials.

Further, the conclusions in this paragraph are not compatible with one another because he concludes there will be

draw-downs but increases in the water level.

25. Mr. Mower's conclusions in paragraph 17 are not accurate in that they rely upon facts not supported in the State Engineer's decisions. That your affiant concludes that the water levels will not appreciably increase, rather, when pumping occurs, water levels generally decrease if water is pumped from the same basin.

26. Mr. Mower's conclusions in paragraph 18 are questionable and likely to be inaccurate; the net effect of long-term pumping of DMAD wells and removal from the Basin of water which is totally consumed will result in a net lower [sic] of water levels and availability in the basin generally. The .40 acre foot of retention asserted by the affiant to be left and on which the affiant concludes there will be a saving, never has been drawn from the basin, based on the pumping records of the defendant companies which have been examined by your affiant since pumping began in 1959 to the present.

27. That the conclusions in paragraph 19 made by Mr. Mower are likely to be inaccurate because they are in part based on facts not indicated in the memorandum decisions of the State Engineer, and the removal of water at the IPP site over a 40-year period will likely generally reduce water levels in the basin. Further, Mr. Mower's conclusions are again incompatable [sic]; it is not physically possible to have an increase in water levels and a reduction to phreatophytes. Further, Mr. Mower's conclusions are incompatible in that he indicates that the water level will rise and argues that there will be a reduction in draw-down.

28. The 20th paragraph in Mr. Mower's affidavit are [sic] not accurate in that they [sic] rely [sic] upon facts not supported in the State Engineer's decisions. That your affiant concludes that the water levels will not appreciably increase, rather, when pumping occurs, water levels generally decrease if water is pumped from the same basin.

29. The conclusions in Mr. Mower's 21st paragraph are questionable in that the change of the place of water removal will likely not have the result that Mr. Mower claims it will have. Your affiant's opinion is that the conclusions herein are based on insufficient data and out-of-date testing and based on computations not subject to refutation by affidavit since such computations are not included in Mr. Mower's affidavit.

Further, the amount the affiant assumes will be retained has never been withdrawn and is already being retained in the basin.

30. The conclusions in Mr. Mower's 22nd paragraph are based on facts not within the State Engineer's decisions, and further, his conclusions with respect to draw-down and phreatophytes are again inconsistent.

31. The conclusions in paragraph 23 are highly questionable and likely to be inaccurate and are based upon facts not set out in the State Engineer's decisions, old data and insufficient information.

32. That the affidavit of Mr. Mower does not give the water levels in the IPP wells, such water levels not being available at this time. Again, based upon insufficient data and on out-dated data, these conclusions constitute his personal judgment and are highly questionable and likely to be inaccurate especially when the conclusions in his affidavit and the affidavit of Roger Walker generally are seen in the light that the maximum withdrawal from the underground is in excess of 10,500 feet and that an additional approximately 35,000 feet will be taken from the river and that it is highly probable that the net effect on the basin will not be as Mr. Mower sets out in his affidavit rather the opposite will result.

The second Neeley affidavit states, among other things, that:

13. The affiant has reviewed and is aware of all of the available data concerning the Sevier River Groundwater Basin. He has had an opportunity to

review all data which the State Engineer could or would have had available on which he made his decision. Based on the available information, the affiant concludes that the State Engineer did not have sufficient data on which to make the decisions which he made in this case.

14. Affiant has personal knowledge of each of the matters herein set out and has personal knowledge of all facts and data on which he relies for the opinions herein set out.

15. The Proof of Appropriation does not state the permissive safe yield, the permissive sustained yield, the maximum sustained yield, the maximum mining yield, and the permissive mining yield, and also there was no ground water inventory prepared, a hydraulic equation or the potential of saline ground water intrusion stated.

16. That without such information, no realistic assessment can be made as to the use of the DMAD wells for any purpose other than for irrigation at the rate of past uses. The State Engineer recognizes such a situation and a cooperative investigation with the U.S.G.S. and the Utah State Agriculture University [sic] is under way, which should provide current data for use in reaching many important conclusions which must be made prior to any change in the present regimen or conditions in the area.

17. The total water recorded and, or used, from the DMAD wells during the period of 1959 to 1979 was 139,187 acre feet.

18. The DMAD proposal of removing 25,000 acre feet per year from the same wells would have amounted to 525,000 acre feet for the period 1959–1979.

19. The an-ual [sic] removal of $25,000 [sic—25,000?] acre feet from the aquifer as against the past operational average annual removal will do irretrievable damage to the aquifer, the present irrigation, municipal and industrial users.

20. The four DMAD canal companies are separate irrigation entities as defined by the Cox Decree and as such have no interests in the area where it is proposed for transfer and change in the nature of use from a higher use to a lower use such as defined by the Utah Code Section 73–3–2.

21. The massive pumping as proposed from an aquifer by the eight DMAD wells in the Sevier River bed may conceivably cause a lowering of the water table to such a point as to cause an accelerated recharge to the aquifer from the primary flows of the Sevier River, thus depriving the irrigators of water awarded under the Cox Decree.

22. Until a comprehensive program of investigation is undertaken and the results tabulated and approved, there can be no safe or conclusive answers as to how much water can be safely removed from the Sevier River aquifer bed.

23. That such a program of investigation should consider, as a minimum, the methods and procedures as outlines [sic] in the following U.S.G.S. Ground Water Publications:

No. 1544–H

No. 1544–C

No. 1545–B

No. 1545–C

No. 1544–E

No. 1536–I

No. 1536–G

No. 1536–F

Also, the American Society of Civil Engineers Manual, "Ground Water Basin Management" and reprints (1961).

24. The present irrigation uses of the water from the aquifer by the local wells alone has produced a steady decline in the water surfaces of the aquifer since 1950 to the present.

25. The 25,000 acre feet proposed to be transferred from the DMAD wells has been mistakenly taken as a firm water right, but it is more in the nature of a paper right. In simple words, no such quantity has been pumped for past use of the companies, the submitted Proof of Appropriation presents a false premise, there is no assurance such quantities of

water are available without disturbing the aquifer.

26. The DMAD companies are acting as a brokerage of water which belongs to the public as stated by Utah Code Section 73–1–1 and as well as the Utah State Constitution.

27. An all year around removal of the quantity of water as proposed would disturb the imbalance in removal of water and recharge of the aquifer. We are dealing with a natural phenomena, the acquifer, and not a bathtub.

28. The ecology and environment [sic] balance of the area would be upset, affecting the sustaining balance of animal life and plant life in the area. Two proposals have been made; one raises the water 40 feet which would make a swamp area of the area. A second proposal was to lower the water table 40 feet which would make a desert.

29. The loss of plant life in the area would, in effect, produce a Sahara Desert like area on the one hand or a swamp on the other, both of which would sound the death knell for the area.

As can be seen from the portions of the affidavits set forth above, the parties' experts express diametrically opposing opinions on the central issue of whether the approval of the change applications will impair existing water rights in the Sevier River ground-water basin.

### III.

#### *Jackson v. Cox, No. 18055*

This action involves fourteen change applications[4] regarding points of diversion of wells located along the Sevier River. The water from these wells has heretofore been used on a seasonal basis for irrigation and incidental stockwatering. Pursuant to the change, the water would be used year-round for industrial purposes and would be fully consumed. The complaint alleges that the appellants own water rights in the ground-water basin and that the proposed

changes will result in impairment of those rights.

There are only two affidavits on file in this case, one each from Mower and Neeley. The Mower affidavit is identical to the one filed in *Crafts v. Hansen,* No. 18054, discussed above. It does not make any specific analysis of the fourteen individual change applications at issue in the lawsuit, but does discuss Change Applications Nos. a–10862 and a–10863, as well as 13 of the wells involved here. The conclusions are generally based on the net combined effect on the ground-water basin of all the proposed changes; there is no breakdown respecting the specific changes involved in this case. We have already summarized Mower's conclusions in our discussion of *Crafts v. Hansen, supra.* They are essentially that: 1) there will be no adverse effect on ground-water levels in the Sevier Desert ground-water basin, long-term or short-term, as a result of enlarging the annual period of diversion from seasonal to year-round; and 2) the effect on the basin as a whole will be "less adverse by pumping water as proposed by the changes than solely for irrigation use."

The Neeley affidavit is identical to the one filed in all five of these cases. It challenges both aspects of the Mower opinion just summarized, and concludes "that water levels will not appreciably increase, rather, when pumping occurs water levels generally decrease if water is pumped from the same basin."

### IV.

#### *Brown v. Hansen, No. 18056*

This case concerns Change Application No. a–10862, which was filed to obtain a permanent change of points of diversion, place, and nature of use of water from eight wells, evidenced by 13 applications to appropriate underground water, in order to conform to the proofs of appropriation. The application seeks to change the rights from direct flow for seasonal use for irriga-

---

4. Nos. a–10952, a–10953, a–10954, a–10955, a–10956, a–10968, a–10969, a–10970, a–10971, a–10972, a–10973, a–10981, a–10997, and a–11009.

tion to a year-round storage right. The complaint alleges that the proposed change will: 1) impair the plaintiffs' prior water appropriations and pending applications, 2) interfere with the wells of some of the plaintiffs, and 3) unlawfully enlarge the rights which are the subject of the change applications because the DMAD companies have never pumped or beneficially used the number of acre feet of water sought to be diverted by the change.

The Mower affidavit filed herein is identical to the one described in the preceding two cases. There are two Neeley affidavits; the first is the same one filed in each of the five cases in this appeal, which has already been discussed and set forth at length. The second was prepared specifically for this lawsuit, and states in pertinent part:

15. That the removal of 25,556.2 acre feet from the already overburdened aquifer will have a detrimental effect on the aquifer and will substantially impair the rights of other users of ground water in the area.

16. The removal of 25,556.2 acre feet from the aquifer will impair the supplemental right of the shareholders of the DMAD Companies whether they are selling water or not.

17. The proofs filed in connection with application 10862 do not bear out the claims for acreage, quantities of water beneficially applied and the time period during which the water has been used.

18. The proofs filed in connection with application 10862 are insufficient and they totally fail to comply with the requirements of Utah law, in that they fail to consider all of the facts available and ignore facts as a necessity to and an attempt to establish its validity.

19. The cultivated area claimed under the proof includes irrigatable [sic] lands which in fact lie idle from year to year.

20. The total amount of water available in all basin sources would—using the diversion factor as applied by the State Engineer—allow only 37,076.25 acres to be irrigated in 1979. The other maximum amount of irrigatable [sic] acreage can be arrived at by dividing the total water available by four for any given year.

21. In the year of gathering the proof in connection with application 10862, 1975 and 1976, there was not 36,722.2 acre feet pumped, but in 1975 there was 2,807 acre feet pumped and in 1976 there was 2,265 acre feet pumped.

22. That the quantities which the State Engineer purports to allow in this case will likely conflict with the permissive sustained yield and permissive mining yield of the source and will likely ultimately result in the destruction of the supply or seriously damage the supply.

23. That the affiant Mower has on various occasions stated that the water table as a result of the proposed pumping will either raise or lower forty feet. Either of these changes in the water table in the area will have a drastically detrimental effect on other users of the water in the source.

As can be seen from the portions of the affidavits set forth above, the parties' experts express diametrically opposing opinions on the central issue of whether the approval of the change applications will impair existing water rights in the Sevier River ground-water basin.

## V.

*Moody v. Central Water Co., No. 18057*

In this case, application No. a–10927 was filed to change the points of diversion, place, and nature of use of part or all of the water rights of the Central Utah Water Company, under the Cox Decree, in the Sevier River and Lower Molin Spring, and storage rights in the Sevier Bridge Reservoir and Fool Creek Reservoir. The proposal would change an indefinite flow and quantity of water from irrigation and stockwater use to industrial use at the IPP. The Central Utah Water Co. proposes to release portions of its water into the DMAD Reservoir and to convey that water to the

IPP for year-round, fully consumptive industrial use. The remaining portion of the decreed water right would be used for irrigation of approximately 4,600 acres of land under the Upper Central Utah Canal or for maintenance of the return flows of the Sevier River. The pleadings in the lawsuit raise three factual questions: 1) whether the appellants are owners of water rights in the Sevier River system; 2) whether the proposed change would impair the rights of other water users in the area involved; and 3) whether the change would constitute an enlargement of the original rights in question.

There were three affidavits on the motion for summary judgment in this case: a third Mower affidavit addressed specifically to this change application, the Walker affidavit also filed in *Crafts v. IPP,* No. 18053, *supra,* and *Crafts v. Hansen,* No. 18054, *supra,* and the Neeley affidavit filed in all five lawsuits. The Mower affidavit gives the opinion that the proposed change "will not reduce the natural recharge into the artesian aquifers of the Sevier Desert ground-water basin." His affidavit does not address either of the other two issues, namely, ownership of the water rights and enlargement of the rights. The Walker affidavit, as already noted earlier, deals not only with Change Application No. a–10927, involved in this lawsuit, but also with Change Applications Nos. a–10862, a–10863, and a–10864 involved in the other cases. That affidavit is summarized in our discussion of *Crafts v. IPP, supra,* and gives Walker's opinion that the available water supply and diversion records support all of the State Engineer's findings. It further sets forth in detail numerous projected benefits from the proposed change which, in Walker's opinion, are "more than adequate to fully compensate any and all other water users for any damages, if any there be, which might result from the affirm[ance] of [the State Engineer's decisions]." The Neeley affidavit, set forth earlier in this opinion, states that Mower's data is incomplete and out-of-date, and that his conclusory

opinions are inaccurate. It states further that year-round water use and the proposed changes will have a net effect on the ground-water basin which is opposite to that postulated in the Mower affidavit. Neeley's opinion is that water levels in the basin will be lowered, and that all wells in the area will be adversely affected.

## CONCLUSION

Having completed the foregoing review and comparison of the affidavits, which were the only evidence before the trial court in each of these five cases, we cannot agree with the trial court's assessment that they present no genuine issues of material fact. As can be seen by a reading of the portions of the affidavits we have discussed and reproduced, the parties' experts express diametrically opposing opinions on the central issue of impairment of existing water rights in the Sevier River ground-water basin. The absence of genuine issues of material fact is of course a prerequisite to the granting of summary judgment, and that requirement is not met here. *See* Utah R.Civ.P. 56. The respondents' arguments respecting the standards for approval of change applications, the burden of proof on the "reason to believe" issue, and the authority of the State Engineer to make his approval conditional and interlocutory are all accurate. They are, however, irrelevant to the basis upon which we reverse the summary judgments in these cases, namely, that the affidavits establish genuine issues of material fact which preclude the granting of summary judgment and require a trial. *See, e.g., Schaer v. State,* Utah, 657 P.2d 1337 (1983). It is noteworthy that none of the respondents have, so far as we can determine, cited a single case wherein the trial court upheld an order of the State Engineer in a water dispute by summary judgment on the basis of opinion testimony in affidavits. Every case discussed by the respondents was decided after a full trial in district court.[5] We do not mean to suggest

5. *See, e.g., Daniels Irrigation Co. v. Daniel Summit Co.,* Utah, 571 P.2d 1323 (1977); *East*

*Bench Irrigation Co. v. State,* 5 Utah 2d 235, 300 P.2d 603 (1956); *Bullock v. Tracy,* 4 Utah

by this observation that summary judgment is not available in a hearing de novo concerning a determination of the State Engineer. Where the requirements of Rule 56 are met, a moving party would of course be entitled to relief. However, the fact that summary disposition of such cases appears to have been rare or nonexistent does underscore the nature and kind of evidence likely to be relied on by the parties therein, and offered by the parties here.

The future impact of changes in allocation and use of water resources in a large geographical area is not generally susceptible of direct observation, measurement and calculation. Great reliance must be placed upon expert judgment based on professional knowledge and training, familiarity with the geography, and as much accurate data as can be acquired in the process of making future projections. As we have emphasized throughout this opinion, we are not dealing so much with "facts" in these cases as with the opinion of experts about the accuracy and legitimacy of the projections based upon the available facts. The Neeley affidavits in all five cases flatly state . that Mower's professional opinion is inaccurate because the data relied on is insufficient to support the opinion. We have no means, nor did the trial court, of assessing either the Neeley opinion or the data relied on by Mower. Cross-examination of Mower and Walker by the appellants at trial could very well show that Neeley's opinion is correct, and that the conclusions of Mower and Walker constitute nothing more than "guesswork." We do not hold, as the appellants appear to ask, that there must be an indefinite delay of the determination of this matter until every conceivable piece of information and data is collected. The determinative question before the trial court will be whether there is reason to believe, on the basis of current information, that existing water rights will not be impaired by the changes proposed in the applications. Once the respondents make a prima facie showing at trial that there is reason to believe, on the basis of available data, that the changes can be lawfully approved, the appellants will have the burden of proving by a preponderance of the evidence *either* that the available data is insufficient to give rise to "reason to believe," *or* that available data in fact creates a reason to believe that the changes cannot lawfully be approved. We rely in this ruling on the fact that, if the opinion in the Neeley affidavits respecting the current status of the data and the probable impact of the changes were believed by the trier of fact, the State Engineer's approval would have to be reversed. Thus, summary judgment is precluded because there exists the factual issue of whether there was reason to believe that approval of the change applications would impair the vested water rights of the appellants.[6]

The summary judgments entered in all five cases are reversed, and they are remanded for a factual trial on the merits. No costs awarded.

STEWART and HOWE, JJ., concur.

OAKS, Justice (dissenting):

I dissent because I believe the majority opinion answers the wrong question and

2d 370, 294 P.2d 707 (1956); *Lehi Irrigation Co. v. Jones,* 115 Utah 136, 202 P.2d 892 (1949); *Whitmore v. Murray City,* 107 Utah 445, 154 P.2d 748 (1944); *Tanner v. Bacon,* 103 Utah 494, 136 P.2d 957 (1943); *Little Cottonwood Water Co. v. Kimball,* 76 Utah 243, 289 P. 116 (1930); *In re Application # 7600,* 63 Utah 311, 225 P. 605 (1924); *Brady v. McGonagle,* 57 Utah 424, 195 P. 188 (1921).

**6.** In its first order granting partial summary judgment to the Utah State defendants-respondents, the trial court held that the issues before it were strictly limited to those which were or could have been raised before the State Engineer, and that "the criteria governing the approval or rejection of said Change Applications ... is limited to a determination of whether there is reason to believe that [they] can be approved without substantially impairing any water rights of Plaintiffs." It does not appear that either of these holdings has been disputed on this appeal, and our reversal of the final order of summary judgment does not extend to these preliminary orders, which will therefore govern at trial.

unwittingly reverses a long-standing and important rule governing the function of the state engineer in approving change applications.

In effect, the majority defines the central issue as whether the expert's affidavits raise any "genuine issue of material fact" as to whether the proposed changes can be made without impairing vested water rights? If that were the issue, I would concur, since the majority opinion conclusively demonstrates that there are issues of fact on that question.

But this is not a case where the district court was called upon to *adjudicate priorities or other vested rights.* This is evident from the majority's concession that the issues before the district court in this case are strictly limited to those properly before the state engineer, because it is well settled that the state engineer cannot adjudicate the priority or extent of vested rights. *E.g., Daniels Irrigation Co. v. Daniel Summit Co.,* Utah, 571 P.2d 1323, 1324 (1977); *East Bench Irrigation Co. v. State,* 5 Utah 2d 235, 240, 300 P.2d 603, 607 (1956); *Whitmore v. Murray City,* 107 Utah 445, 450–51, 154 P.2d 748, 750 (1944); *United States v. District Court of Fourth Judicial District,* 121 Utah 18, 242 P.2d 774 (1952).

What is at issue in this case is the propriety of an administrative decision by which the state engineer authorized a *change in the place of diversion or use or the manner of use of water* owned by the applicants. That decision is governed by a different standard than the district court employs in determining whether to grant summary judgment in an adjudication of vested rights.

U.C.A., 1953, § 73–3–3 provides that "no such change shall be made if it impairs any vested right without just compensation." Contrary to the approach of the majority, that statute does not require an adjudication of vested rights in order to approve a change application. In the context of Utah water law and the assigned function of the state engineer, a succession of cases has applied the direction of § 73–3–3 in terms of whether there is "reason to believe" that the change can be made without impairing vested rights. This is the practical equivalent of a probable cause determination in a criminal case.

Under our cases, the state engineer (or the district court in a de novo appeal from the state engineer's decision) must approve a change application "if the tribunal concludes that there is reason to believe that no existing right will thereby be impaired." *United States v. District Court of Fourth Judicial District,* 121 Utah 18, 24, 242 P.2d 774, 777 (1952). This "reason to believe" rule is repeatedly stated in this same opinion. 121 Utah at 20–21, 242 P.2d at 775–76. It is also stated in the earlier opinion in the same case, *United States v. District Court of Fourth Judicial District,* 121 Utah 1, 10–12, 238 P.2d 1132, 1136–37 (1951), and in a succession of later cases. *Piute Reservoir & Irrigation Co. v. West Panguitch Irrigation & Reservoir Co.,* 13 Utah 2d 6, 7–8, 10, 367 P.2d 855, 856, 858 (1962); *Salt Lake City v. Boundary Springs Water Users Association,* 2 Utah 2d 141, 143–44, 270 P.2d 453, 455 (1954).

The meaning, intent, and function of the "reason to believe" rule are best explained in *United States v. District Court of Fourth Judicial District,* 121 Utah at 11–12, 238 P.2d at 1137, as follows:

From these decisions and the cases cited above, it is clear that the district court's judgment can only cover the issues subject to determination by the Engineer and that the effect of such judgment is the same as it would have been if the Engineer had reached the same conclusion in the first instance. *The Engineer in granting an application does not determine that the applicant's rights are prior to the rights of the protestant but only finds there is reason to believe that the application may be granted and some water beneficially used thereunder without interfering with the rights of others* .... Such a decision is administrative in

nature and purpose and the decision of the court on review, except for the formalities of the trial and judgment is of the same nature and for the same purpose. The object of the engineer's office is to maintain order and efficiency in the appropriation, distribution and conservation of water and to allow as much water to be beneficially used as possible. *So construed, the law provides a period of experimentation* during which ways and means may be sought to make beneficial use of more water under the application before the rights of the parties are finally adjudicated. *If we were to finally adjudicate applicant's right to change or to appropriate water at the time that such application was rejected or approved, he would get only such rights as he could establish by a preponderance of the evidence that he could use beneficially without interfering with the rights of others and in such hearing he would not have the benefit of any opportunity to experiment and demonstrate what he could do.* Such a system would cut off the possibility of establishing many valuable rights without a chance to demonstrate what could be done. [Emphasis added.]

*Accord, Eardley v. Terry,* 94 Utah 367, 77 P.2d 362 (1938).

It is abundantly clear from the order and summary judgment in this case that all the district court held was that there was *"reason to believe* that said Change Applications can be approved on the same terms and conditions as set forth in the ... Decisions of the State Engineer thereon without impairing the existing water rights of plaintiffs." (Emphasis added.) In so ordering, the district court phrased the issue correctly. And, in view of the content of the Mower and Walker affidavits, there was no error in the court's resolution of that issue. Its order should be affirmed.

The majority reverses the district court because the Mower and Walker affidavits were contradicted by Neeley. But when the determination is "probable cause" or "reason to believe," the question of "whether there is a genuine issue of material fact" is a contradiction in terms. In determining whether there is "reason to believe" a proponent's submission, the fact that it has been contradicted is not disabling. A probable cause determination is not the time to resolve contradictions. That comes later, in the formal adjudication. In this case, that will be a proceeding to adjudicate whether vested rights are in fact being impaired.

A change application can be denied by the state engineer or by the court on appeal from the engineer's decision, but not simply on the basis of what the majority calls "the production of evidence which controverts the existence of 'reason to believe.'" That standard would subvert the purpose of this preliminary administrative determination. A change application should only be denied when, after resolving all contradictions in favor of the proponent of change, the evidence offered is so deficient that it provides no reason to believe that the proposed change could be made without impairing rights. *Piute Reservoir & Irrigation Co. v. West Panguitch Irrigation & Reservoir Co., supra.* This is not such a case.

By reversing the district court and remanding this case for trial to resolve issues of fact on the existence of "reason to believe," the majority effectively reverses the "reason to believe" test and telescopes an interlocutory administrative determination on a change application into a mini-adjudication of vested rights. Seen in a larger context, this is just one more instance where the law is being changed in a manner that will make it more complicated and require more time, more money, and more lawyers and judges for its administration. *See* Bok, "A Flawed System," *Harvard Magazine,* May-June 1983, at 38, 42–44. Change applications previously handled by laymen and technical experts will now need to be administered by lawyers and judges in a preliminary adversary proceeding in any case where an opponent files contradictory material. If the change application is ap-

proved, the opponent can later compel a second adversary proceeding to adjudicate the actual impairment of vested rights.

The adversary determination of infringements on vested rights should take place only once, after a change application has been approved administratively upon a preliminary showing of "reason to believe." Then the adjudication of vested rights can be made on the basis of evidence tied to experience, rather than upon the conflicting estimates that will be bruited about in the preliminary trial required by the majority in this case.

HALL, C.J., concurs in the dissenting opinion of OAKS, J.